**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

| | |
|---|---|
| VILLAGE OF LAKEWOOD, a municipal Corporation, d/b/a REDTAIL GOLF CLUB, ) ) | |
| ) | Case No. 06 C 3508 |
| Plaintiff, ) | |
| ) | Judge Philip G. Reinhard |
| vs ) | |
| ) | Magistrate Judge P. Michael Mahoney |
| PFG GOLF, a division of Information Leasing Corporation n/k/a National City Commercial Capital Corporation, an Ohio corporation, ) ) ) ) | |
| Defendant. ) ) | |
| PFG GOLF, a division of Information Leasing Corporation n/k/a National City Commercial Capital Corporation, an Ohio corporation, ) ) ) ) | |
| Counter-Plaintiff, ) | |
| vs ) ) | |
| VILLAGE OF LAKEWOOD, a municipal Corporation, d/b/a REDTAIL GOLF CLUB, ) ) ) | |
| Counter-Defendant. ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE BRIEF IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The Village of Lakewood ("Lakewood"), as its Reply to Defendant's Response Brief in Opposition to Plaintiff's Motion for Summary Judgment, states:

Lakewood's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (the "Motion"), filed with this court on January 31, 2007 and a true and correct copy of which is attached hereto as Exhibit A, is hereby incorporated by reference. Lakewood's Motion should be granted because there are no genuine issues of material fact and Lakewood is entitled to judgment as a matter of law.

I. **THERE ARE NO GENUINE ISSUES OF MATERIAL FACT REGARDING THE LEASE'S VIOLATION OF SECTION 8-1-7(A) OF THE ILLINOIS MUNICIPAL CODE**

    A. **LAKEWOOD DID NOT APPROPRIATE FUNDS PRIOR TO MAKING THE CONTRACT AND INCURRING EXPENSES**

Contrary to PFG Golf's argument in Part B of its Response to Lakewood's Motion (the "Response"), there is no genuine issue of material fact as to whether Lakewood appropriated funds prior to the Lease. Section 8-1-7(a) of the Illinois Municipal Code states that:

> no contract shall be made by the corporate authorities … and no expense shall be incurred by any of the officers or departments of any municipality, whether the objects of the expenditure has been ordered by the corporate authorities or not, unless an appropriation has been previously made concerning that contract or expense. 65 ILCS 5/8-1-7(a).

The issue is whether an appropriation had been made prior to the execution of the Lease. There is no genuine issue of material fact here, and PFG Golf's attempt to create one is misleading. Part B of the Response argues that the approval of Ordinance No. 2004-21 constituted an appropriation concerning the Lease. However, PFG Golf has failed to introduce any summary judgment evidence in support of their contention.

If anything, Ordinance No. 2004-21 gave the Village President the authority to enter into the Lease on behalf of the Village. The Ordinance in no way appropriated funds for the Lease. Paragraph 6 of the Affidavit of Wendy Gregoria, Finance Director for the Village of Lakewood, which was filed with this Court on January 31, 2007, and a true and correct copy of which is attached hereto as Exhibit B, states that "Lakewood did not appropriate for the Lease Document involved in this litigation prior to the execution of the Lease Document."

Paragraph 6 of the Affidavit of Wendy Gregoria stands uncontroverted. In fact, PFG Golf has failed to introduce any summary judgment evidence whatsoever to raise a genuine issue of material fact as to whether Lakewood had appropriated funds for the Lease prior to the execution of the Lease on August 26, 2004. It is a well-established principle that "well alleged affidavits in support of motions for summary judgment are substitutes for testimony [and] must be taken as true if left uncontroverted by counter-affidavit." *Estate of Myers*, 120 Ill.App.3d 726, 458 N.E.2d 1102, 1105 (1st Dist. 1983).

In fact, the Ordinance to which PFG Golf refers makes no mention whatsoever of appropriating funds for the Lease. A true and correct copy of that Ordinance is attached hereto as Exhibit C. Rather than considering the plain language of the Ordinance, PFG Golf would rather have this Court consider the minutes of the meeting where the Ordinance was approved. However, even the minutes of that meeting make no mention of any prior appropriation of funds for the Lease. A true and correct copy of the minutes is attached hereto as Exhibit D.

Moreover, no conceivable interpretation of the summary judgment evidence supports the conclusion that there was an appropriation of funds made by Lakewood regarding the Lease prior to the execution of the Lease. Black's Law Dictionary defines "appropriation" as the "act of setting aside a sum of money for a public purpose." Black's Law Dictionary (8th ed., 2004). There is no evidence that Lakewood acted to set aside a sum of money for the public purpose of effectuating and paying for the Lease. Rather, the evidence, including the Affidavit of Wendy Gregoria, establishes that no appropriation was made. Considering the summary judgment evidence, there is no genuine issue as to whether there was a prior appropriation. Since all the summary judgment evidence establishes that there was no prior appropriation, under section 8-1-7(a) of the Illinois Municipal Code, Lakewood had no power to enter into the Lease. Therefore, the Lease is *ultra vires* and void *ab initio* as to Lakewood. See *Nielsen-Massey Vanillas, Inc. v. City of Waukegan*, 276 Ill.App.3d 146, 657 N.E.2d 1201, 1207 (2nd Dist. 1995), *Branigar v. Village of Riverdale*, 396 Ill. 534, 72 N.E.2d 201, 205-06 (1947).

B.     **PFG GOLF'S ARGUMENT FOR A "SPECIAL FUND" EXCEPTION FAILS**

PFG Golf believes that because the user fees paid by the equipment users to Lakewood were then sent from Lakewood to PFG Golf, that a "special fund" was created, and that the existence of this "special fund" alone creates an exception to the appropriation requirement of section 8-1-7(a) of the Illinois Municipal Code.

There is also no genuine issue of material fact as to how rent payments were structured and made under the lease. The standard in determining whether payments fall under the "special fund" exception to the prior appropriation requirement of section 8-1-7 of the Illinois Municipal code is whether the sums "*might* be payable from the general corporate fund." *Collins v. Village*

*of Glen Ellyn*, 21 Ill.App.2d 373, 378, 158 N.E.2d 89, 92 (2nd District, 1959). Moreover, if the special fund ever carries a deficit, the exception does not apply. *Kinzer v. City of Chicago*, 128 Ill.2d 437, 444, 539 N.E.2d 1216, 1219 (1989). The "special fund" exception does not apply when the special fund can become part of the general fund or when debt is created on the part of the municipality. *Branigar v. Village of Riverdale*, 396 Ill. 534, 545, 72 N.E.2d 201, 206-07. A municipality does not have the power to make contracts which violate the Municipal Code, even if the contract has a severability clause which purports to strike any invalid portions of the contract. *Walters v. Colfax*, 466 F.Supp.2d 1046, 1053-57 (C.D.Ill., 2006). If the contract contains contingencies where the municipality may have to pay from its general fund, the contract is void if no prior appropriations were made. See *Beling v. City of East Moline*, 14 Ill.App.2d 263, 144 N.E.2d 865, 869-70 (2nd Dist. 1957).

In the present case, no special fund was created by Lakewood. PFG Golf has introduced absolutely no summary judgment evidence that Lakewood created a separate fund or bank account that was to cover Lakewood's obligations under the lease. PFG Golf has introduced no summary judgment evidence that Lakewood ever levied a special assessment or tax that was to cover Lakewood's obligations under the lease. PFG Golf's theory of a special fund claims that fees paid by golfers to Lakewood were a "special fund" somehow set apart from the rest of the revenue received by Lakewood. The theory further requires this Court to believe that the fees retained their allegedly unique character while being held by Lakewood, even though the fees were fungible assets commingled with the other funds taken in by Lakewood through Red Tail Golf Course. However, as this brief will show, even if this Court finds that such a "special fund" existed, the "special fund" exception to the appropriation requirement will not apply because the

alleged "special fund" was limited in scope and Lakewood incurred many debts and obligations under the Lease that were wholly outside any conceivable "special fund."

### C. DEBTS AND PAYMENTS THAT WERE OR COULD HAVE BEEN FROM THE GENERAL FUND

The terms of the Lease are undisputed. There is no genuine issue of material fact as to the terms of the Lease. A true and correct copy of the Lease, along with all agreements, documents, and addenda made a part thereof, is attached hereto as Exhibit E.[1] PFG Golf's contention that a "special funding scheme" was created stems from the "Pay for Play" Payment Schedule under the Lease. However, the Payment Schedule itself does not constitute the full range of how payments could have been or were, in fact, made from Lakewood to PFG Golf. As set forth below, numerous provisions under the lease show how sums could have been payable from the general fund (*Collins*), how debt was or could have been created on behalf of Lakewood (*Branigar*), and how there were several contingencies payable out of the general fund (*Beling*).

#### 1. Lakewood owed daily interim rent before the user fees were collected

In paragraph 6 of the Lease, Lakewood, as Lessor under the Lease, was required to pay "daily interim rent, on all Equipment subject to this Lease, for the period from the date of delivery of Equipment (or any part thereof) to and including the day immediately preceding the Rental Commencement Day." The Rental Commencement Day, under that same paragraph, was either "the date on which the Equipment is delivered to Lessee" or "any later date selected by Lessor." Therefore, the earliest possible Commencement Day would have been the date of delivery.

The provisions concerning daily interim rent make it clear that the debt is imposed on the day immediately preceding the Rental Commencement Day. If the Rental Commencement Day was the day of delivery of the equipment, then rent was due before the user fees could have been collected. This would be a debt created for Lakewood wherein PFG Golf would have no special fund created yet for reimbursement, since no usage fees would be generated before actual installation and use of the equipment.

---

[1] This Reply Brief will reference the Lease as amended by the Payment Schedule, by the Addendum to the Lease, and by the Addendum to the Payment Schedule.

If the Rental Commencement Day was deemed by PFG Golf to be some day after delivery, then Lakewood would be indebted for several days of "daily interim rent." Nowhere in the Lease is it stated or claimed that a special fund would be created for this "daily interim rent." Rather, paragraph 6 states that such interim rent would be "calculated on a 360 day year." Thus, the calculation of daily rent is completely outside the user-generated fee scheme of the Payment Schedule that PFG Golf believes to constitute a special fund. Daily rent was a financial obligation of Lakewood's general fund, since Lakewood undertook financial obligations by signing the Lease and no special funding provisions were made concerning the daily rent. There was no appropriation made to cover the daily rent payments.

### 2. **Debts and Financial Obligations Not Directly Payable to PFG Golf**

The user-generated fees might have paid for some debt incurred by Lakewood under the Lease, but they did not cover the secondary financial obligations of Lakewood. To illustrate, paragraph 7 of the Lease states:

> "Lessee shall, at its sole expense, provide electrical power and power outlets needed for the operation of the Equipment. Lessee is also required to provide access from its network to the internet through a local internet service provider (ISP) and will provide, at Lessee's cost, any additional phone lines necessary to complete the installation."

Thus, both parties, through the Lease, contemplated the expenditure of funds by Lakewood that would not go directly to PFG Golf. Lakewood was required to cover the cost of electrical power for the GPS units, the cost of internet services, the cost of maintaining additional phone lines, and the cost of installing additional power outlets. These expenses and costs fall outside the Payment Schedule and as such were never part of the alleged "special fund." No appropriation was ever made to cover these expenses and costs. Since no appropriation was made regarding these expenses, the contract is *ultra vires* and void *ab initio* as to Lakewood.

Paragraph 8 of the Lease imposed additional debts on Lakewood at the end of the Lease: "Lessee will pay all expenses of deinstalling, crafting and shipping, and Lessee will insure the Equipment for its full replacement value during shipping." Similar to the installation costs, these termination costs fall outside the Payment Schedule, were never part of the "special fund" claimed by PFG Golf, and no appropriation was ever made regarding the termination costs.

### 3. The Required Purchase of the Equipment

Paragraph 10(C) of the Lease states:

> If any item of Equipment is damaged or does not meet the standards set forth above for the return condition of such Equipment or if the Lessee fails to discharge Lessee's obligations set forth above with regard to any item of Equipment, Lessee shall pay to Lessor, immediately upon demand, the Full Replacement Value of such item of Equipment.

Under the clear language of this paragraph of the Lease, the parties contemplated that Lakewood might be required to purchase the Equipment. Obviously, such a purchase could not have been funded through the usage fee based "Pay for Play" scheme. No appropriation was made for the possible required purchase of the Equipment.

### 4. Loss and Damage

Lakewood, as Lessor, was also obligated under paragraph 13 of the Lease to pay for all damages to the Equipment:

> In the event of any loss with respect to particular Equipment, Lessee shall either (a) place such Equipment in good repair, condition and working order, (b) replace such Equipment with like equipment (of the same year, make, model and accessories) in good repair, condition and working order, or (c) pay to the Lessor the Full Replacement Value of such Equipment … If, due to theft, destruction, damage or other loss, the Equipment is non-operable for more than seven days, Lessee shall pay to Lessor an amount, pro-rated for each day that the Equipment is non-operable, equal to the number of rounds for each month set forth in the Payment Schedule times the Usage Fee.

Two types of payment, neither of which could be part of the alleged special funding scheme of the Pay for Play agreement, are contemplated in this paragraph. First, Lakewood was required to repair or replace the equipment, or pay PFG Golf for the loss or damage of any piece of leased equipment. No special fund for such payments or debts was created. Any special fund would have only covered the regular per-use lease payments. Lakewood's obligation to pay for, repair, or replace damaged or lost equipment was a financial obligation of the Village itself and not of any special fund.

Second, Lakewood had to pay PFG Golf in the event any piece of equipment was inoperable for more than seven days. These downtime expenses could not have come from

usage fees, as functional equipment was needed to charge for usage fees. Therefore, downtime expenses were separate from and outside any special funding scheme.

### 5. <u>Insurance</u>

Paragraph 14 of the lease required Lakewood to purchase and/or maintain an "extended coverage property insurance policy covering the Equipment for its full replacement value" as well as "a comprehensive general liability insurance policy or other similar form of third party liability coverage." Further, in the event that Lakewood did not carry an insurance policy, Lakewood would have to pay to PFG Golf "each month a risk charge stipulated and liquidated at 35% of Lessor's original Equipment cost." Neither the contingent no-insurance penalty charges nor the cost of insuring the leased equipment were appropriated or covered under the "special fund" allegedly created by the Pay for Play scheme. Rather, the cost of the insurance policy and the contingent liability of the no-insurance penalties were debts and liabilities of the Village where no prior appropriations had been made.

### 6. <u>Remedies in the event of Default</u>

Two of the several remedies available to PFG Golf in the event of default under the contract demonstrate that PFG Golf looked to Lakewood's general fund for payment:

> (ii) Lessor may require Lessee to immediately pay Lessor, as compensation for loss of Lessor's bargain and not as a penalty, a sum equal to the Stipulated Loss Value,
>
> * * *
>
> (v) Lessor may exercise any other right or remedy available at law or in equity.

These remedies show that PFG Golf was not looking solely to the alleged special fund for recovery. Rather, in the event of default, PFG Golf wanted to be compensated for the entire Stipulated Loss Value of the Equipment. Furthermore, the contract provided that PFG Golf could exercise "any other right or remedy available at law or in equity." By the unmistakably clear language of the Lease itself, PFG Golf did not limit its recovery to the alleged special fund created by the Pay for Play scheme. Rather, PFG Golf could sue the Village of Lakewood directly or seek any number of available remedies which would fall outside the alleged special

funding scheme. In fact, PFG Golf has filed a counterclaim with this Court seeking a judgment of monetary damages from the general fund of Lakewood. See *Belig*, 144 N.E.2d at 869.

### 7. Indemnity

Under paragraph 21 of the Lease, Lakewood was required to:

> indemnify, defend and hold harmless the Lessor, its directors, officers, employees, shareholders, agents, successors, and permitted assigns (the "Indemnified Party" [sic]) from any and all claims, costs, taxes, expenses, damages, and liabilities arising from or pertaining to the use, possession, or operation of the Equipment.

The costs of indemnifying and defending the Indemnified Parties (as defined in the Lease) in a lawsuit could clearly not be covered by the user fees in the alleged special fund. Rather, the Village itself would be liable for any claims against the Indemnified Parties. The indemnity provisions did not require any special fund to indemnify the Indemnified Parties; the Village as Lessee was clearly the indemnifying party. As such, the indemnification clauses created debts and liabilities to the corporation and not to any "special fund." There was no appropriation made for indemnifying the Indemnified Parties.

### 8. Late Fees under the Payment Schedule

Paragraph 3 of the Payment Schedule, as amended by the Addendum, states: "In addition, any amounts not paid within 10 days of the due date of the payment will incur a late fee of 1 ½ % of the late balance or the maximum rate allowed by law[,] whichever is lower, from the date payment was due [sic]." These late fees were not appropriated, nor were they covered by Usage Fees. They constitute a contingent liability for the general fund of the Village of Lakewood.

### D. EXTENT OF THE ALLEGED SPECIAL FUND

As shown above, the Lease created many debts and obligations for the Village. These debts and obligations were not related in any way to the Payment Schedule, the purported basis for the special fund claimed by PFG Golf.

Any special fund would have a limited scope. PFG Golf relies heavily on paragraph 4 of the Payment Schedule in arguing that there is a genuine issue of material fact as to whether there was a special funding scheme established. It should be noted that the mere existence of a special funding scheme is not a material issue. The material issue is whether PFG Golf looked solely to a special fund for collection of all payments. Put differently, were there any debts or obligations

incurred by Lakewood, or were all debts and obligations covered by a special fund? It is clear that any special fund was limited in scope to the payment of Usage Fees alone, and not to any other fees, payments, penalties, costs, or other debts and obligations under the Lease.

The fourth paragraph of the Payment Schedule which PFG Golf relies upon in arguing for the existence of the special fund demonstrates just how limited the scope of any special fund would be. In that paragraph, Lakewood "acknowledges that it is acting as a fiduciary of Lessor *when collecting and remitting Usage Fees*[.]" Thus, the scope of any special fund is limited to the payment of Usage Fees. Nowhere in the Payment Schedule is it mentioned that the Usage Fees should cover any other obligations, monetary or otherwise, that Lakewood owes to PFG Golf under the contract. Nowhere does it say that PFG Golf will look solely to the Usage Fees for payment.

Moreover, if PFG Golf believed that there was a shortfall in Usage Fees, Lakewood was obligated under paragraph 5 of the Schedule to pay for an audit as well as a penalty of 10% of the shortage. Clearly, the penalty for a shortfall in Usage Fees could not come from future Usage Fees, which are already dedicated as the rent under the Lease. Thus, the penalty would have to come from outside the "special fund." Thus, PFG Golf was looking to the general corporate fund for payment of this penalty. No appropriation was made for the possibility of such penalty payments.

## II. ALTERNATIVELY, LAKEWOOD IS ENTITLED TO SUMMARY JUDGMENT UNDER 65 ILCS 5/8-1-7(B)

If this Court finds that there is no genuine issue of material fact as to (1) whether an appropriation for the Lease, and (2) whether the Lease contained debts and obligations on behalf of the Village of Lakewood which were not covered by the Usage Fee "special fund," then Lakewood is entitled to judgment as a matter of law under 65 ILCS 5/8-1-7(a) because the Lease is *ultra vires* and void *ab initio*. If so, the issues of 65 ILCS 5/8-1-7(b) – namely, whether the Lease when executed exceeded the term of the mayor, and whether the Lease related to the provision of data processing equipment or services – are moot.

If this Court finds that there is a genuine issue of material fact regarding appropriations and the special fund, then Lakewood's Motion for Summary Judgment should still be granted because there are no genuine issues of material fact regarding 65 ILCS 5/8-1-7(b) and Lakewood is entitled to judgment as a matter of law.

A.  THE VILLAGE PRESIDENT'S TERM ENDED BEFORE THE END OF THE TERM OF THE LEASE

In its Response to Lakewood's Motion for Summary Judgment, PFG Golf seems to argue that the term of the Lease did not exceed the term of the Village President because the President happened to win another term in office, or that the Village President's remaining in office creates an exception to the plain language of the statute. PFG Golf cites no statute, case, or other authority as to how Acting President Richardson's subsequent term as President rehabilitates the Lease under section 8-1-7(b) of the Illinois Municipal Code. PFG Golf's implication that "term" equates to the full duration of a village president's service is nonsensical.

Several sections of the Illinois Municipal Code use the word "term" as it applies to village officers. Section 3.1-10-15 states:

> The terms of elected municipal officers shall commence at the first regular or special meeting of the corporate authorities during the month of May following the proclamation of the results of the regular municipal election at which the officers were elected, except as otherwise provided by ordinance fixing the date for inauguration of newly elected officers of a municipality.

This section contemplates both the election and re-election of municipal officers. The statute clearly states that a term begins at the first municipal meeting following the election results. In order for a new term to begin, the old term must, obviously, end.

Section 3.1-15-10 states that:

> The chief executive officer shall hold office for 4 years and until a successor is elected and has qualified, except in municipalities that have adopted a 2 year term as provided in Section 3.1-10-65 and except in a village or incorporated town that, before January 1, 1942, has adopted a 2 year term for the chief executive officer.

Clearly, the term of a village president or mayor is 4 years, or 2 years if amended by referendum. It is not however long the president or mayor happens to stay in office due to successive re-elections. As stated in *Grassini v. DuPage Township*, 279 Ill.App.3d 614, 216 Ill.Dec. 602, 665 N.E.2d 860 (3d Dist. 1996) and quoted in *Walters v. Village of Colfax*, 466 F.Supp.2d 1052, *supra*, "it is contrary to the effective administration of a political subdivision to allow elected officials to tie the hands of their successors with respect to the decision regarding the welfare of the subdivision."

Acting President Richardson had no idea of knowing that she would be elected after the expiration of her term and had no authority to bind any possible successor to a contract under section 8-1-7(b). Indeed, her first term ended and her new term under the Illinois Municipal Code began when she was duly elected to the office of Village President on May 10, 2005. By the very terms of the Lease, the Lease was executed on August 26, 2004 and was to run for 60 months. Moreover, the 60 month term of the lease is longer than any possible term for a non-home rule village president, as that term is set at four years. See 65 ILCS 5/3.1-15-10. Therefore, there is no genuine issue that term of the Lease exceeded the term of the Village President in violation of section 8-1-7(b) of the Illinois Municipal Code.

There is no genuine issue that the term of Lakewood's president ended on May 10, 2005. Rather, PFG Golf argues that this Court should disregard the plain language of the statute and read a "consecutive term" exception into the statute where none exists. However, no such exception has been read into the statute by Illinois courts. This court must not disregard the plain meaning of the statute. Rather, this court should "give effect to the intention of the legislature, and the language of the statute is the starting point of the court's analysis …When the language of the statute is clear and unambiguous, it will be given effect without resort to other tools of construction." *Segers v. Industrial Commission*, 191 Ill.2d 421, 732 N.E.2d 488, 494 (Ill. 2000).

**B.** **DATA PROCESSING EQUIPMENT AND SERVICES**

There is also no genuine issue as to whether the Lease related to "the provision of data processing equipment and services." If the lease is for "the provision of data processing and services" and extends past the term of the village president when executed, then the Lease violated section 8-1-7(b) of the Illinois Municipal Code, giving Lakewood no power to enter into the Lease, and making the Lease *ultra vires* and void *ab initio*. Although it should be clear to this Court that a lease of GPS units was a lease for "the provision of data processing equipment and services," PFG Golf argues in its Response to Lakewood's Motion for Summary Judgment that there is a genuine issue as to whether the Lease concerned data processing equipment and services. For the reasons detailed below, this court should find that there is no such issue.

<u>Documents provided from PFG Golf to Lakewood</u>

Materials provided to Lakewood prior to the execution of the Lease show that the Lease was for data processing equipment and services. A true and correct copy of a brochure provided to Lakewood regarding the GPS equipment from Pro Link is attached hereto as Exhibit F.

Moreover, the Lease itself shows internet access was required for installation and monitoring of the equipment. Because the materials provided from PFG Golf to Lakewood indicate the data-processing nature of the Equipment, PFG Golf's argument that global positioning system units might not be data processing equipment is disingenuous.

### Affidavit of Wendy Gregoria and Website Advertisements

The Affidavit of Wendy Gregoria, paragraph 5, states that the Lease was for data processing equipment and services.[2] Moreover, the advertisements for the GPS Equipment publicly advertised at Pro Link's website belie PFG Golf's specious argument that the GPS units are not data processing equipment. A true and correct copy of these advertisements is attached hereto as Exhibit G.

### Patents Held by ProLink

Pro Link's website advertises the patents to which it holds rights. A true, correct, and current (as of the date this Reply is filed) copy of the "Patents" section of the website is attached hereto, along with a true and correct copy of the abstracts of two patents listed therein, as Exhibit H. The abstracts clearly indicate that the ProLink system leases as the "Equipment" under the Lease from PFG Golf to Lakewood, constitutes data processing equipment and services. The abstract U.S. Patent No. 6,470,242 even states that "Each roving unit includes a central processing unit (CPU) including a *data processor* for executing various tasks" (emphasis added).

### Common Understanding of GPS Units

Neither "data processing equipment" nor "data processing services" nor "global positioning system" are terms so arcane that they can not be readily understood and interpreted by this Court and by laypersons. A common-sense understanding of the Lease Equipment shows that there is no genuine issue that the Lease concerned "data processing equipment and services." There is no genuine issue that GPS units, or global positioning system units, transmit and process factual information, or data. The golf-specific data processed by the equipment in question included golf scoring for various players, course information, hole information, shot information, and the ordering of snacks and beverages.

---

[2] PFG Golf has filed a motion to strike the fifth paragraph of Ms. Gregoria's affidavit, claiming that Ms. Gregoria is not sufficiently qualified to testify that the leased global positioning systems equipment was data processing equipment and that data processing services were involved in the Lease. Even if this Court were to agree with PFG Golf and strike that paragraph of the Affidavit, there would still be no genuine issue that the Lease was for data processing equipment and services for the reasons outlined in this brief.

### Caselaw shows that GPS units are data processing equipment

A non-precedential case from the Federal Appendix discussed the nature and capabilities of a different type of global positioning system used on golf carts. *Optimal Recreation Solutions, LLP v. Leading Edge Technologies, Inc.*, 6 Fed.Appx. 873 (Fed. Cir., 2001) (not cited as precedent). The court examined all the various functions of the GPS receivers and mobile units. See *id.* While the GPS units leased from PFG Golf to Lakewood are not identical to the units discussed in the cited case, the court's discussion about GPS units shows that they are indeed data processing equipment. A seventh circuit case briefly discussed "a GPS (global positioning system) 'memory tracking unit'," stating that the device "receives and stores satellite signals that indicate the device's location." *U.S. v. Garcia*, 474 F.3d 994, 995 (7th Cir., 2007). Such functions clearly constitute data processing.

### The language of the Lease reveals the data-processing nature of the Equipment

The very language of the Lease shows that data was processed by the Equipment. This may be seen in the distinction between the "optional Pay for Play" program and the "non-optional Pay for Play" program. The description of the optional Pay for Play program indicates that the equipment user, the golfer, has an option after the first two or three holes to cancel the service and get a refund. This cancellation is done through the equipment itself. The makes a selection on the unit as to whether to continue or cancel the service, and the information is processed and transmitted back to the clubhouse. If the clubhouse receives the opt-out transmission, the user gets a refund.

Additionally, the first paragraph of the Payment Schedule describes part of the basic functionality and purpose of the GPS units: "the basic functionality of the System [includes] yardage and time clock for ahead or behind pace of play." Calculating yardage and pace of play certainly constitutes data processing. The Equipment is therefore data processing equipment and the service provided by the Equipment is clearly a data processing service.

Therefore, there is no genuine issue of material fact as to whether the Lease was a contract for the provision of data processing equipment or services. There is also no genuine issue of material fact as to whether the Lease extended beyond the term of the village president at the time the Lease was executed. Therefore, Lakewood had no power to execute the Lease under section 8-1-7(b) of the Illinois Municipal Code, making the Lease *ultra vires* and void *ab initio*. Because the execution of the Lease was *ultra vires* and the Lease was void from its

inception, Lakewood is entitled, as a matter of law, to a declaratory judgment that the lease is void. Therefore, summary judgment is appropriate.

## III.  CONCLUSION

This Reply has shown that Lakewood should be granted summary judgment on two separate bases for the following reasons:

(1) Summary judgment is appropriate because there is no genuine issue that appropriation for the Lease was ever made and there is no genuine issue that debts and obligations were created for Lakewood, thus making the Lease *ultra vires* and void *ab initio* under section 8-1-7(a) of the Illinois Municipal Code; and

(2) Summary judgment is appropriate because there is no genuine issue that the Lease extended beyond the term of the Village President at the time of the Lease's execution and there is no genuine issue that the Lease concerned the provision of data processing equipment and services, thus making the Lease *ultra vires* and void *ab initio* under section 8-1-7(b) of the Illinois Municipal Code.

For all of the above stated reasons, the Village of Lakewood requests that this Court grant the Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and for such other relief as this Court deems appropriate.

        Respectfully submitted,
        VILLAGE OF LAKEWOOD


        By: s/ Kevin G. Costello
            Kevin G. Costello


Kevin G. Costello
Atty No. 06196839
Attorney for Plaintiff
Zukowski, Rogers, Flood & McArdle
50 Virginia Street
Crystal Lake, IL 60014
(815) 459-2050 Telephone
(815) 459-9057 Facsimile

# CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on this 16th day of April, 2007, a true and correct copy of the foregoing ***Plaintiff's Reply to Defendants' Response Brief in Opposition to Plaintiff's Motion for Summary Judgment*** was filed electronically in accordance with the General Order on Electronic Case Filing, constituting service upon the following Filing Users:

TO:	Vincent T. Borst
	Jennifer E. Gaylord
	Askounis & Borst, P.C.
	180 N. Stetson Street, Ste. 3400
	Chicago, IL 60601


		/s/ Kevin G. Costello