## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

VILLAGE OF LAKEWOOD, a municipal )
corporation, d/b/a REDTAIL GOLF CLUB, )
                                  )
                Plaintiff, )
vs                               )     CASE NO.: 06-C-3508
                                    )
PFG GOLF, a division of Information Leasing )
Corporation n/k/a National City Commercial )     Judge Philip G. Reinhard
Capital Corporation, an Ohio corporation, )
                                    )     Magistrate Judge P. Michael Mahoney
                Defendant. )
_____ )
                                    )
PFG GOLF, a division of Information Leasing )
Corporation n/k/a National City Commercial )
Capital Corporation, )
                Counter-Plaintiff, )
vs                               )
                                    )
VILLAGE OF LAKEWOOD, a municipal )
Corporation d/b/a REDTAIL GOLF CLUB )
                                    )
                Counter-Defendant. )

## MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S
## PETITION FOR DECLARATORY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

Village of Lakewood ("Lakewood"), as its Motion for Summary Judgment on Plaintiff's

Petition for Declaratory Judgment pursuant to Fed. R. Civ. P. 56, states:

      1.      Lakewood's Petition for Declaratory Judgment seeks to declare that a lease

agreement between Lakewood and Defendant, PFG Golf, is *ultra vires* and void *ab initio* as to

Lakewood.

      2.      PFG Golf, filed a counterclaim for breach of contract against Lakewood on August

28, 2006.



3.      Should the court grant this motion, declaring the lease document attached to the Petition for Declaratory Judgment and incorporated herein by reference void *ab initio* ("Lease Document"), the counterclaim by PFG Golf would be moot, resolving all the matters before the Court, because no breach of a void contract can occur.

4.      If this motion is granted, Lakewood would also be entitled to a judgment of rescission and restitution as a matter of law as prayed for in Count III of the Petition for Declaratory Judgment.

5.      Summary Judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.

6.      Two grounds exist for granting Lakewood's motion based on the uncontested facts that, (1) no prior appropriation for the Lease Document was made by Lakewood as required under 65 ILCS 5/8-1-7(a) as alleged in Count I of the Petition for Declaratory Judgment and alternatively; (2) that the Lease for data processing equipment and services extended beyond the term of the president holding office at the time the Lease Document was executed as prohibited under 65 ILCS 5/8-1-7(b) as alleged in Count II of the Petition for Declaratory Judgment.

## I.      <u>Lack of Prior Appropriation as Required Under 65 ILCS 5/8-1-7(a)</u>

7.      65 ILCS 5/8-1-7(a) states:

> [N]o contract shall be made by the corporate authorities, or by any committee or member thereof, and no expense shall be incurred by any of the officers or departments of any municipality, whether the object of the expenditure has been ordered by the corporate authorities or not, unless an appropriation has been previously made concerning that contract or expense. Any contract made, or any expense otherwise incurred, in violation of the provisions of

> this section shall be null and void as to the municipality, and no
> money belonging thereto shall be paid on account thereof.

8.     Therefore, a contract which is not appropriated for is void ab *initio*. <u>Chicago</u> <u>Patrolman's Association v. City of Chicago,</u> 56 Ill.2d 503, 508, 309 N.E.2d 3, 6 (1974).

9.     It is uncontested that the Lease Document was signed by the parties on August 26, 2004.   See paragraph 3 of PFG Golf's Answer filed August 28, 2006, incorporated herein by reference ("Answer").

10.     No appropriation was made prior to August 26, 2004 for the expense incurred by the Lease Document.  See Affidavit of Wendy Gregoria, attached hereto and incorporated by reference as Exhibit 1 ("Affidavit of Wendy Gregoria").

## II. The Lease Document, Pertaining to Data Equipment and Services, Extended Beyond the Term of the President Then Holding Office in Violation of 65 ILCS 5/8-1-7(b)

1-10.     The Village hereby incorporates Paragraphs 1 through 14 above as 1 through 14 herein.

11.     PFG Golf, by failing to deny or state it has insufficient information to admit or deny Paragraph 15 of the Petition for Declaratory Judgment pursuant to Fed R. Civ. P 8 in its Answer, has admitted that the lease pertains to the lease and service of data processing equipment and services.  See Answer, Paragraph 15.  See also McComb v. Blue Star Auto Stores, 164 F2d 329 (7th Cir. 1947).

12.     Also, the Village has presented evidence which shows that the lease pertains to data equipment and services.  See Affidavit of Wendy Gregoria.

13.     The Acting Village President when the Lease Document was executed on August 26, 2004 was Julie Richardson, whose first term of office ended on May 10, 2005. See Affidavit of Wendy Gregoria and certified copies of the oaths of office, attached thereto as Exhibits C & D and incorporated herein by reference.

14.     Julie Richardson took office on May 10, 2005 after being elected and is the current Village President for the Village of Lakewood. See Affidavit of Wendy Gregoria and certified copies of the oaths of office, attached thereto as Exhibit D and incorporated herein by reference.

15.     65 ILCS 5/8-1-7(b) states:

> [T]he corporate authorities of any municipality may make contracts for a term exceeding one year and not exceeding the term of the mayor or president holding office at the time the contract is executed, relating to: . . .(3) the provision of data processing equipment and services.

16.     The Lease Document extended beyond the then current term of office and is therefore void as a matter of law pursuant to 65 ILCS 5/8-1-7(b).

WHEREFORE, the Village of Lakewood requests that summary judgment be granted in its favor and against PFG Golf for all relief prayed for in the petition in this matter.

Village of Lakewood,

s/ Kevin G. Costello
Kevin G. Costello

Kevin G. Costello
Attorney No. 06196839
ZUKOWSKI, ROGERS, FLOOD & MC ARDLE
50 Virginia Street
Crystal Lake, Illinois 60014
(815) 459-2050 Telephone
(815) 459-9057 Facsimile
U:\vvaughn\Lakewood\Redtail\Motion for Summary Judgment.doc

4

Case 1:06-cv-03508    Document 34-2    Filed 04/02/2007    Page 1 of 2

Case 1:06-cv-03508    Document 30-2    Filed 01/31/2007    Page 1 of 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

VILLAGE OF LAKEWOOD, a municipal )
corporation, d/b/a REDTAIL GOLF CLUB, )
                                )
         Plaintiff, )
                                )
    vs )
                                )
PFG GOLF, a division of Information Leasing )
Corporation n/k/a National City Commercial )
Capital Corporation, an Ohio corporation, )
                                )
         Defendant. )
_____)
                                )
PFG GOLF, a division of Information Leasing )
Corporation n/k/a National City Commercial )
Capital Corporation, )
         Counter-Plaintiff, )
                                )
    vs )
                                )
VILLAGE OF LAKEWOOD, a municipal )
Corporation d/b/a REDTAIL GOLF CLUB )
                                )
         Counter-Defendant. )

CASE NO.: 06-C-3508

Judge Philip G. Reinhard

Magistrate Judge P. Michael Mahoney

## AFFIDAVIT OF WENDY GREGORIA

1. I am the Finance Director for the Village of Lakewood, McHenry County, Illinois ("Lakewood") and have acted in that capacity and in other capacities for the Village for over ten years.

2. I have all financial records of Lakewood in my possession and I am familiar with how all financial records of Lakewood are kept in the regular course of business.

3. I am familiar with all financial records pertaining to the Lease Document in this matter and expenses under the Lease Document.

4. I am familiar with how all records are kept in the regular course of business pertaining to the type of rounds and cost of each round for golf rounds at Redtail Golf Club, owned by Lakewood.

5. A Lease Document was signed relating to GPS data equipment and services for golf carts on August 26, 2004.

6. Lakewood did not appropriate for the Lease Document involved in this litigation prior to the execution of the Lease Document. See the Budget Ordinances from Fiscal Years 2004-2007, certified copies of which are attached hereto and incorporated by reference as Group Exhibit A.

ALL-STATE LEGAL®
EXHIBIT
B

NOV-17-2006 Case 1:06-cv-03508 WSK Document 30-2 MCA Filed 01/31/2007 815 459 2057    P.03/03

7. The Lease document signed on August 24, 2004 extended beyond the term of the Village President.

8. Blair R. Picard was elected the Village President and subsequently took office on April 27, 1999, as evidenced by the certified copy of his official oath, attached hereto and incorporated by reference as Exhibit B.

9. Blair R. Picard resigned as active Village President and Julie Richardson took the oath of office on March 25, 2004, a certified copy of which is attached hereto and incorporated by reference as Exhibit C.

10. Julie R. Richardson was then elected to office and signed the oath of office on May 10, 2005, a certified copy of which is attached hereto and incorporated by reference as Exhibit D.

*Wendy Gregoria*

Wendy Gregoria, Finance Director
Village of Lakewood

SWORN to and SUBSCRIBED before me this 30th day of November 2006.

*Susan L. Ville*
Notary Public

Official Seal
Susan L. Ville
Notary Public State of Illinois
My Commission Expires 03/20/07

TOTAL P.03

August 7, 2004 (5:14AM)

# ORDINANCE NO._____

### *An Ordinance Authorizing the Execution of a Lease Rental Agreement with PFG Golf Finance, a division of Information Leasing Corporation for a Golf Yardage and Cart Management System for Use at RedTail Golf Club*

WHEREAS, Section 11-94-1 *et. seq.* of the Illinois Municipal Code (Chapter 65 of the Illinois Compiled Statutes) authorizes municipalities with a population of less than 500,000 to purchase, improve and operate golf courses with all powers incidental thereto;

WHEREAS, the Village of Lakewood, an Illinois municipal corporation located in McHenry County, Illinois (the "Village"), owns and operates RedTail Golf Club;

WHEREAS, the Village's Board of Trustees believe it is in the interests of the Village to enter into that certain lease rental agreement with PFG Golf Finance, a division of Information Leasing Corporation, a copy of which is attached hereto as Exhibit A and incorporated herein by this reference (the "Agreement") for the provision of a golf yardage and cart management system for RedTail Golf Club to ensure that such facility continues to be a first class, high quality golf course facility.

NOW, THEREFORE, BE IT ORDAINED by the VILLAGE OF LAKEWOOD, McHenry County, Illinois, as follows:

SECTION 1: That the Village hereby adopts the Agreement, and to that end, the President and Clerk are hereby authorized to execute and attest the Agreement on

RedTail Golf Club, Page 1



behalf of the Village.

SECTION 2: If any section, paragraph, subdivision, clause, sentence or provision of this Ordinance shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, invalidate or nullify the remainder thereof, which remainder shall remain and continue in full force and effect.

SECTION 3: All ordinances or parts of ordinances in conflict herewith are hereby repealed to the extent of such conflict.

SECTION 4: This Ordinance shall be in full force and effect upon its passage, approval and publication in pamphlet form (which publication is hereby authorized) as provided by law.

Ayes:
Nays:
Absent:
Abstain:

APPROVED:

_____
Acting Village President Julie C. Richardson

(SEAL)
ATTEST:_____
      Village Clerk Janice S. Hansen

Passed:
Approved: _____

Published: _____

RedTail Golf Club, Page 2

# C E R T I F I C A T I O N

I, JANICE S. HANSEN, do hereby certify that I am the duly appointed, acting and qualified Clerk of the Village of Lakewood, McHenry County, Illinois, and that as such Clerk, I am the keeper of the records and minutes and proceedings of the President and Board of Trustees of said Village of Lakewood.

I do further certify that at a regular meeting of the President and Board of Trustees of the Village of Lakewood, held on the _____ day of August, 2004, the foregoing Ordinance entitled *An Ordinance Authorizing the Execution of a Lease Rental Agreement with PFG Golf Finance, a division of Information Leasing Corporation for a Golf Yardage and Cart Management System for Use at RedTail Golf Club* was duly passed by the President and Board of Trustees of the Village of Lakewood.

The pamphlet form of Ordinance No. _____, including the Ordinance and a cover sheet thereof, was prepared, and a copy of such Ordinance was available in the Village Hall, commencing on the _____ day of _____, 2004, and continuing for at least 10 days thereafter. Copies of such Ordinance were also available for public inspection upon request in the office of the Village Clerk.

I do further certify that the original, of which the attached is a true and correct copy, is entrusted to me as the Clerk of said Village for safekeeping, and that I am the lawful custodian and keeper of the same.

Given under my hand and seal of the Village of Lakewood this _____ day of _____, 2004.

_____
Janice S. Hansen, Village Clerk
Village of Lakewood,
McHenry County, Illinois

(SEAL)

## VILLAGE OF LAKEWOOD
## MINUTES OF THE VILLAGE BOARD MEETING
### AUGUST 24, 2004

The Village Board Meeting was called to order at 7:30 p.m. Present were Acting Village President Richardson; Trustees Clark, Davis, and Hendricks. Trustees Schrauf and Smith were absent. Also present were Village Administrator Catherine Peterson; Village Clerk Janice Hansen; Village Treasurer Gene Furey; Village Attorney Richard Flood; Chief of Police Lawrence Howell; Public Works Foreman Barry Wickersheim; and 5 members of the public.

**PUBLIC COMMENTS ON AGENDA ITEMS:** None

**CONSENT AGENDA:** The following was considered and enacted on a single motion by Trustee Davis, seconded by Acting President Richardson:

**APPROVAL OF BILL LIST:** Accounts Payable dated August 25, 2004 in the Amount of $108,951.18

**APPROVAL OF FINANCIAL STATEMENTS:** None

**APPROVAL OF A CRYSTAL LAKE SPECIAL USE PERMIT FROM CRYSTAL LAKE WATER SKI ASSOCIATION TO HOST A WATER SKI SHOW AND TO WAIVE NO-WAKE LIMITATIONS FOR THE PARTICIPANTS ON SUNDAY, SEPTEMBER 5, 2004 FROM 3:00 P.M. TO 5:00 P.M. AND MONDAY, SEPTEMBER 6, 2004 FROM 3:00 P.M. TO 7:00 P.M.**

**APPROVAL FOR THE SUBMITTAL OF AN APPLICATION FOR A WATER QUALITY MANAGEMENT PLAN AMENDMENT TO THE NORTHEASTERN ILLINOIS PLANNING COMMISSION (NIPC) TO AMENDING THE EXISTING FACILITIES PLANNING AREA (FPA)**

**APPROVAL FOR CRYSTAL LAKE PARK DISTRICT REQUEST TO RUN ITS 8TH ANNUAL CRYSTAL LAKE HALF-MARATHON ON VILLAGE STREETS, SUNDAY, SEPTEMBER 12, 2004 FROM 8:00 A.M. TO 11:00 A.M.**

Voting Aye on the Consent Agenda Motion: Acting Village President Richardson; Trustees Clark, Davis, and Hendricks. Absent: Trustees Schrauf and Smith. Voting Nay: None. Motion declared carried.

**ITEMS REMOVED FROM THE CONSENT AGENDA:**

**APPROVAL OF MINUTES:** August 10, 2004 Regular Board Meeting



**Village Board Meeting Minutes**
**August 24, 2004**
**Page Two of Three**

Trustee Clark asked about the revised Village Board Meeting Agenda. He does not like the idea of moving Public Comments to the end of the Agenda. He feels that the residents comments are very important. Acting President Richardson agreed that public comments were very important. However, due to the ongoing nature of the extensive public comments at the beginning of the past several meetings, it was increasingly difficult to conduct the necessary business of the Village. There were also fiscal considerations for the change, insofar as the consultants hired by the Village of Lakewood are generally paid on an hourly basis. It does not seem fiscally responsible to pay these types of individuals to sit and listen to lengthy public comments unrelated to their issue. She also noted that residents would still have an opportunity to comment about any issues. She further noted that this format was typically used in other communities. Trustee Hendricks commented that this change was an improvement to the Agenda and could save the Village time and money. Trustee Davis would like to give the public two to three minutes at the beginning of the Meeting, if the matter takes more time, it could be discussed later in the Meeting. While it was the general consensus to retain the revised Agenda, Trustee Clark asked for discussion prior to any future changes.

Trustee Clark, seconded by Trustee Davis, moved to approve the August 10, 2004 Minutes. Voting Aye: Acting President Richardson; Trustees Clark, Davis, and Hendricks. Absent: Trustees Schrauf and Smith. Voting Nay: None. Motion declared carried.

**LEGISLATIVE UPDATE: SENATOR PAMELA ALTHOFF:** Due to a previous commitment Senator Althoff was not able to attend the meeting.

**ORDINANCE NO. 2004-21 – AN ORDINANCE AMENDING SECTION 8.01, FEES, OF THE MUNICIPAL CODE:** Attorney Flood stated that the contract differences with Prolink/Parview, LLC for a Global Positioning System for RedTail Golf Course have been resolved. The insurance questions have been addressed with the insurance carrier. The additional insurance cost for the equipment is $12 per cart per year. The five year lease agreement is still in place. If golfers do not use the system, the Village is not obligated to pay GPS. If the Golf Course does not collect fees for the GPS, the Village does not owe Prolink any money. Trustee Hendricks, seconded by Trustee Davis, moved to approve Ordinance 2004-21 and the Prolink/Parview LLC Contract as reviewed by the Village Attorney. Voting Aye: Trustees Clark, Davis, and Hendricks. Voting Nay: Acting President Richardson. Absent: Trustees Schrauf and Smith. Motion declared carried.

Village Board Meeting Minutes
August 24, 2004
Page Three of Three

**PUBLIC COMMENTS:** Mr. and Mrs. Moll of 7222 Braemar Circle inquired about the winter and early spring deer killing on the McHenry County Conservation District property near the Village. Chief of Police Howell is aware of the situation and has been in regular contact with McHenry County Conservation personnel and the Illinois Department of Natural Resources. It was suggested that notification to residents should be implemented when a future deer kill occurs.

Cindy Carvey, owner of lot #15 in Hidden Lakes, questioned the validity of the $200 lot mowing violation fee from the Village. Ms. Carvey alleges that she was not properly notified of the lot mowing. Village Ordinance states "all parcels of land in the Village shall be mowed and maintained so that the height of the lawn, or other vegetation thereon, at no time exceeds five inches . . .". Ms. Carvey is upset that Public Works mowed her lot and also may have mowed over a few newly planted seedlings. Acting President Richardson stated that the Village has received a number of calls regarding the lot mowing enforcement. Notification of the Lot Mowing Ordinance to all residents and lot owners will be addressed by staff .

**REPORTS:** Village Clerk Janice Hansen has addressed the project list of the Turnberry Lakes Committee. The parking lot located at Lake #1 has been repaved. The boat launches at Lakes #1 and #3 have been adjusted with additional gravel by Public Works Department. Information regarding seawalls has been obtained from Crystal Lake Park District. Also, staff is researching the purchase of new piers for Lake #1 and #2. The Board of Trustees asked Ms. Hansen to schedule a meeting of the Turnberry Lakes Committee as requested by Chairman Lambruschi. Several Trustees committed to attend the meeting to discuss future projects.

Acting President Richardson stated that some residents in Brighton Oaks have switched the anodes in water heaters from aluminum to magnesium and seem to have better water quality.

Trustee Clark inquired about the status of the Village's revised Tree and Infill Ordinances. These issues are scheduled to be presented to the Planning and Zoning Commission at the meeting on September 20, 2004. Also, Trustee Clark would like to be notified of the meetings of the Northeastern Illinois Planning Commission pertaining to the waste water expansion project.

Trustee Hendricks asked about the status of the 2004 Road Program. Public Works Foreman Barry Wickersheim stated that the project was on schedule.

With nothing further to discuss, Trustee Clark, seconded by Acting President Richardson, moved to adjourn the Meeting. All present voted aye. Motion declared carried. The Meeting adjourned at 8:45 p.m.

Janice S. Hansen
Village Clerk

Approved: _____ Dated: September 14, 2004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

VILLAGE OF LAKEWOOD, a municipal )
corporation, d/b/a REDTAIL GOLF CLUB, )
    )
              Plaintiff,    )
    )       CASE NO.: 06-C-3508
      vs    )
    )       Judge Philip G. Reinhard
PFG GOLF, a division of Information Leasing )
Corporation n/k/a National City Commercial )
Capital Corporation, an Ohio corporation, )       Magistrate Judge P. Michael Mahoney
    )
              Defendant.    )
_____)
    )
PFG GOLF, a division of Information Leasing )
Corporation n/k/a National City Commercial )
Capital Corporation, )
              Counter-Plaintiff, )
    )
      vs    )
    )
VILLAGE OF LAKEWOOD, a municipal )
Corporation d/b/a REDTAIL GOLF CLUB )
    )
              Counter-Defendant. )

### VILLAGE OF LAKEWOOD'S RESPONSE TO PFG GOLF'S FIRST REQUEST FOR ADMISSION OF FACTS AND GENUINENESS OF DOCUMENTS

NOW COMES, VILLAGE OF LAKEWOOD a municipal corporation, d/b/a Redtail Golf

Club ("Lakewood"), by and through its attorneys ZUKOWSKI ROGERS, FLOOD &

McARDLE, pursuant to Federal Rule of Civil Procedure 36 on PFG GOLF'S First Request for

Admission of Facts and Genuineness of Documents, and hereby responds as follows:

1.  That the document attached as Exhibit A to Lakewood's Petition and to PFG

Golf's Counterclaim is a true and correct copy of Equipment Lease Agreement No.

PL510800004 (the "Agreement").



**RESPONSE:**

Plaintiff admits that Exhibit A attached to its Petition and PFG's counter-claim is a true and correct copy of Equipment Lease No. PL510800004.

2.  That on August 24, 2004, the Village Board held a meeting in which a majority of the members approved Ordinance No. 2004-21-An Ordinance Amending Sections 8.01, Fees of the Municipal Code (the "Ordinance").

**RESPONSE:**

Plaintiff denies the facts stated in Paragraph 2

3.  That the purpose of the Ordinance was to grant approval for Lakewood to enter the Agreement.

**RESPONSE:**

Plaintiff denies the facts stated in Paragraph 3.

4.  That the Ordinance created a special funding scheme by which PFG Golf would receive funding under the Agreement.

**RESPONSE:**

Plaintiff denies the facts stated in Paragraph 4.

5.  Catherine Peterson, the Village Administrator, executed the Agreement on behalf of Lakewood on August 26, 2004.

**RESPONSE:**

Plaintiff admits the facts stated in Paragraph 5.

6.  That Catherine Peterson was dully authorized to sign the Agreement on behalf of Lakewood.

**RESPONSE:**

Plaintiff admits that the Village Board of August 26, 2006 authorized Catherine Peterson to sign the agreement.  Plaintiff affirmatively states that the Village Board and Catherine Peterson had no authority to bind the Village beyond the time frames provided in the state statutes.

7.  That Lakewood agreed to be subject to the terms and conditions of the Agreement through its execution.

**RESPONSE:**

Plaintiff admits that the Village Board of August 26, 2006 voted to approve the Agreement.  Plaintiff affirmatively states that the Board had no authority beyond that granted by statute.

8.  That Lakewood received and accepted the Equipment identified in Exhibit A of Lakewood's Petition.

**RESPONSE:**

Plaintiff admits to the facts stated in Paragraph 8.  Plaintiff affirmatively states that some of the equipment has failed.

9.  That Lakewood has made some of the required payments under the Agreement through May 2006.

**RESPONSE:**

Plaintiff admits that it has made all payments required under the contract.

10. That Lakewood has failed and refused to make any additional payments in the manner promised under the Agreement.

**RESPONSE:**

Plaintiff denies the facts stated in Paragraph 10.

3

11. That PFG Golf has demanded compliance with the payment terms of the Agreement from Lakewood.

**RESPONSE:**

Plaintiff denies the facts in Paragraph 11.

Village of Lakewood, by and through its attorneys,

_____
Kevin G. Costello

Kevin G. Costello
Attorney No. 06196839
ZUKOWSKI, ROGERS, FLOOD & MCARDLE
50 Virginia Street
Crystal Lake, Illinois 60014
(815) 459-2050; Fax (815) 459-9057
U:\VVAUGHN\LAKEWOOD\REDTAIL\Response.doc

4

STATE OF ILLINOIS  )
        ) SS
COUNTY OF McHENRY )

   The undersigned, a non-attorney, being first duly sworn on oath, deposes and says that she caused a correct copy of the foregoing, **Village of Lakewood's Response to PFG Golf's First Request for Admission of Facts and Genuineness of Documents**, to be served upon counsel at the address set forth below:

Vincent T. Borst, Esq.
Jennifer E. Gaylord, Esq.
ASKOUNIS & BORST, P.C.
Two Prudential Plaza
180 N. Stetson Street, Suite 3400
Chicago, IL 60601

by depositing same in the U.S. Mail at Two Prudential Plaza, 180 North Stetson St., Suite 3400, Chicago, Illinois 60601, with proper postage prepaid on this 20th day of December, 2006.

          By: _Kimberly Scalise_
             Kimberly Scalise

SUBSCRIBED AND SWORN to before me this 20th day of December, 2006.

_Christina A. Walker_
Notary Public

> "OFFICIAL SEAL"
> CHRISTINA A. WALKER
> Notary Public, State of Illinois
> My Commission Expires 05/08/2010

5

## TERMS & CONDITIONS

1. **By signing this Lease,** Lessee acknowledges and agrees that it has read and understands the TERMS AND CONDITIONS OF THIS LEASE, this Lease becomes effective only upon written acceptance by an authorized employee of Lessor, this is a net lease, it cannot terminate or cancel this Lease, it has an UNCONDITIONAL OBLIGATION to make all payments due under this Lease, it cannot withhold, set off or reduce such payments for any reason, it will use the Equipment only for business purposes, the person signing this Lease has the authority to do so and to grant the POWER OF ATTORNEY set forth in paragraph 14 herein, it entered into this Lease rather than purchase the Equipment. THIS LEASE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OHIO; AND TO THE EXCLUSIVE JURISDICTION OF ANY COURT LOCATED IN THE STATE OF OHIO. YOU EXPRESSLY WAIVE (AS HAS THE LESSEE) ANY RIGHT TO A TRIAL BY JURY.

| Lessee   Village of Lakewood, IL. | Lessor   PFG Golf & Turf |
| --- | --- |
| | a division of Information Leasing Corporation ("ILC") |
| X Catherine Peterman | X James Cress |
| Authorized Signature | Authorized Signature |
| Catherine Peterson, Village Administrator   Date 3-26-04 | JAMES CRESS   VP   9-29-04 |
| Print Name and title   Date | Print Name and Title   Date |

2. **LEASE.** Lessee agrees to Lease from Lessor the Equipment or if separately scheduled, the Equipment identified on Schedule A attached and made a part of this Lease.

3. **NO WARRANTIES.** LESSOR IS LEASING THE EQUIPMENT TO THE LESSEE "AS-IS". LESSEE ACKNOWLEDGES THAT THE LESSOR DOES NOT MANUFACTURE THE EQUIPMENT, LESSOR DOES NOT REPRESENT THE MANUFACTURER OR THE SUPPLIER, AND LESSEE HAS SELECTED THE EQUIPMENT AND SUPPLIER BASED UPON LESSEE'S OWN JUDGMENT. LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, NOR WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. LESSEE AGREES THAT REGARDLESS OF CAUSE, LESSOR IS NOT RESPONSIBLE FOR, AND LESSEE WILL NOT MAKE ANY CLAIM AGAINST LESSOR FOR ANY DAMAGES, WHETHER CONSEQUENTIAL, DIRECT, SPECIAL, OR INDIRECT. LESSEE AGREES THAT NEITHER SUPPLIER NOR ANY SALESPERSON, EMPLOYEE OR AGENT OF SUPPLIER IS LESSOR'S AGENT OR HAS ANY AUTHORITY TO SPEAK FOR LESSOR OR TO BIND LESSOR IN ANY WAY. LESSOR TRANSFERS TO LESSEE FOR THE TERM OF THIS LEASE ANY WARRANTIES MADE BY THE MANUFACTURER OR SUPPLIER UNDER A SUPPLY CONTRACT.

4. **ORDERING EQUIPMENT, DELIVERY AND ACCEPTANCE.** If Lessee entered into any purchase or supply contract with any supplier, Lessee assigns to Lessor Lessee's rights under the supply contract, but none of Lessee's obligations, except for the obligation to pay for Equipment if it is accepted by Lessee according to the terms of this Lease. If Lessee has not entered into a supply contract, Lessee authorizes Lessor to enter into a supply contract. Lessee shall arrange for the delivery of the Equipment to Lessee. Lessee shall inspect the Equipment immediately upon Lessee's receipt of the Equipment to determine if it is in good working condition. The Equipment will be deemed irrevocably accepted by Lessee upon the earlier of (a) the date of delivery to Lessor of a signed Certificate of Acceptance of Leased Equipment or (b) ten days after completion of the installation and training of the Equipment. Upon completion of installation and training, the Lessee must supply Lessor with a written list of system deficiencies, if any, within 24 hours.

5. **TERMINATION BY LESSOR.** Lessor shall have the exclusive option to terminate this Lease if within 90 days after Lessee has signed this Lease, the Equipment has not been delivered to Lessee, or Lessee has not accepted the equipment as provided in paragraph 4.

6. **TERM AND RENT.** The term of this Lease commences upon the date on which the Equipment is delivered to Lessee (whether or not accepted) and ends upon the expiration of the number of months specified on the front of this Lease under "Initial Term of Lease" after the Rental Commencement Date. Lessee authorizes Lessor to insert in this Lease as "Rental Commencement Date" the date when the Equipment is delivered to Lessee or any later date selected by Lessor. The Lessee shall pay as rent either: i) the Total Rental Payment indicated on the front of this Lease or ii) if applicable, the amounts as shown on the Payment Schedule, plus applicable taxes ("Rent"). The first rental payment is due on the Rental Commencement Date, and each remaining periodic rental payment is due on the same day of each payment period thereafter for the initial term of lease. Additionally, Lessee shall, upon demand, pay, as rent, daily interim rent on all Equipment subject to this Lease, for the period from the date of delivery of Equipment (or any part thereof) to and including the day immediately preceding the Rental Commencement Date. The daily rent will be calculated on a 360-day year. No portion of any rental payments shall be deemed to constitute payment for any equity interest in the Equipment. If any payment due under this Lease is not paid within 5 days of its due date, Lessee shall pay Lessor a late charge not to exceed 10% of each late payment (or such lesser rate as is the maximum rate allowed by applicable law). Lessee authorizes Lessor to insert in this Lease as "Tax on Rental Payment" and "Total Rental Payment" the appropriate amounts when same are determined by Lessor. If the Payment Schedule is Pay For Play, then Lessor may, upon 30 days prior written notice, terminate this Agreement and remove the Equipment should Lessor, in its sole and absolute discretion, determine that the operation of the Equipment at the Lessee's facility is no longer commercially desirable for Lessor.

7. **ELECTRICAL POWER AND TELEPHONE LINES.** Lessee shall, at its sole expense, provide electrical power and power outlets needed for the operation of the Equipment. Lessee is also required to provide access from its network to the internet through a local internet service provider (ISP) and will provide, at Lessee's cost, any additional phone lines necessary to complete the installation. Lessee will also open the necessary ports on its firewall, if applicable, to allow Lessor access to monitor the health of the Equipment. Lessor will not access any data that is not related to the leased Equipment. Lessee will be responsible for all costs of the installation of necessary telephone lines and the monthly service for such telephone lines and any internet access lines.

Lessee has reviewed this page and certifies that each of the provisions set forth is clear and legible.

Lessee initials: X CJP



**EXHIBIT**

E

ALL-STATE LEGAL®

**8. EQUIPMENT LOCATION; USE AND REPAIR; RETURN.** Lessee will keep and use the Equipment only at the Equipment Location shown on the front of this Lease. Lessee may not move the Equipment without Lessor's prior written consent. At Lessee's own cost and expense, Lessee will keep the Equipment eligible for any manufacturer's certification, in compliance with all applicable laws and in not make any alterations, additions or replacement to the Equipment without Lessor's prior written consent. All alterations, additions and replacements will become part of the Equipment and Lessor's property at no cost or expense to Lessor. Lessor may inspect the Equipment at any reasonable time. Unless Lessee purchases the Equipment at the end of this Lease, Lessee will immediately deliver the Equipment to Lessor to any place in the United States that Lessor tells Lessee. Additionally, the Lessee agrees that the Equipment being returned must meet the Standard Equipment Return Conditions as set forth below. Lessee will pay all expenses of deinstalling, crating and shipping, and Lessee will insure the Equipment for its full replacement value during shipping.

**9. ADVERTISING.** This Agreement shall not confer any rights, financial or otherwise, on Course Owner with respect to advertising rights or revenues associated with the Equipment.

**10. STANDARD EQUIPMENT RETURN CONDITIONS.**

**A.** Notwithstanding anything to the contrary contained in the Lease, and in addition to the terms and conditions contained herein, Lessee shall, at Lessee's sole cost and expense, return all, but not less than all, of such Equipment to Lessor immediately upon the expiration of the Initial Term of Lease or any extensions and with respect to each item of Equipment, as applicable, the following must be true:

•   All safety equipment must be in place and meet applicable federal, state and other governmental standards.

•   All covers and guards must be in place with no sheet metal, plastic or cowling damage.

•   All parts, pieces, components and optional equipment must be present, installed and operational.

•   All accessories shall be returned in proper order.

•   All electronic controls shall operate per manufacturer's specifications. Controls which bypass normal operations shall be repaired at Lessee's expense.

•   All electrical systems shall be able to provide electrical output as specified by the manufacturer.

•   All Equipment must have a relatively clean appearance.

•   All Equipment shall be free from excessive wear necessitating major component repair or replacement caused by lack of recommended maintenance as detailed in customer operation/maintenance manuals.

•   All Equipment shall be free from structural damage or bent frames.

•   Any usage or metering devices must not have been altered in any way.

•   All Equipment attachments, if any, must be in good operating condition.

**B.** **RETURN PERFORMANCE.** Each item of Equipment must be able to complete the following tests:

•   Have all functions and controls work in normal manner

•   Perform its designed functions in a satisfactory manner

**C.** **REQUIRED PURCHASE.** If any item of Equipment is damaged or does not meet the standards set forth above for the return condition of such Equipment or if the Lessee fails to discharge Lessee's obligations set forth above with regard to any item of Equipment, Lessee shall pay to Lessor, immediately upon demand, the Stipulated Loss Value of such item of Equipment.

**11. TAXES.** Lessee shall promptly reimburse Lessor for, or shall pay directly if so requested by Lessor, as additional Rent, all taxes, charges and fees which may now or hereafter be imposed or levied by any governmental body or agency upon or use, location or relocation of the Equipment, or otherwise in connection with the transactions contemplated by the Lease, excluding, however, all taxes on or measured by the net income of Lessor. Lessee agrees to reimburse Lessor for all personal property taxes immediately upon receipt of Lessor's invoice, including without limitation such taxes assessed or arising during the term of this Lease, but remitted by Lessor after the termination of this Lease. At Lessor's option, Lessee agrees to remit, along with Lessee's rental payments under this Lease, an amount equal to a percentage of Lessor's reasonable estimate of the personal property taxes that will be assessable against the Equipment. Any such amounts remitted to Lessor will be credited by Lessor against Lessee's obligations under this paragraph. Lessee will remain obligated in the event that such amounts are insufficient to fully reimburse Lessor the actual amount of such taxes and any surplus will be either credited to Lessee's other obligations to Lessor or returned to Lessee. If requested, Lessee agrees to file promptly on behalf of Lessor all requested tax returns and reports concerning the Equipment in form satisfactory to Lessor, with all appropriate governmental agencies and to mail a copy to Lessor concurrently with the filing thereof. Lessee further agrees to keep or cause to be kept and made available to Lessor any and all necessary records relevant to the use of the Equipment and aforesaid taxes, assessments and other governmental charges.

**12. PURCHASE OPTION; AUTOMATIC RENEWAL.** If no Default exists under this Lease, Lessee will have the option at the end of the Initial or any renewal term to purchase all (but not less than all) of the applicable taxes Unless the Purchase Option is $1.00, Lessee must give Lessor at least 120 days written notice before the end of the Initial Term that Lessee will purchase the Equipment or that Lessee will deliver the Equipment to Lessor. If Lessee does not give Lessor such written notice or if Lessee does not purchase or deliver all but not less than all of the Equipment in accordance with the terms and conditions of this Lease, this Lease will automatically renew for an additional 12-month term and thereafter renew for successive one-month terms until Lessee delivers the Equipment to Lessor or purchases the Equipment. During such renewal(s) the Amount of Each Rental Payment will remain the same. Lessee may cancel an automatic renewal term by sending Lessee written notice 10 days prior to such renewal term. If the Fair Market Value ("FMV") Purchase Option has been selected, Lessee will use Lessor's judgment to determine the Equipment's FMV. FMV shall mean the retail not wholesale FMV determined solely by the Lessor. Upon payment of the Purchase Option price to Lessor plus all applicable taxes, Lessor shall transfer its interest in the Equipment to Lessee "AS IS, WHERE IS" without any representations or warranties whatsoever and this Lease will terminate.

**13. LOSS OR DAMAGE.** Lessee shall bear all risk of loss associated with an item of Equipment, including the theft, destruction, or damage. No such loss shall relieve Lessee from any of its obligations under this Lease. In the event of any loss with respect to particular Equipment, Lessee shall either (a) place such Equipment in good repair, condition and working order, (b) replace such Equipment with like equipment (of the same year, make, model and accessories) in good repair, condition and working order, or (c) pay to the Lessor the Stipulated Loss Value of such Equipment. The Stipulated Loss Value for particular Equipment under a Fixed Rental Payment Schedule,

Lessee has reviewed this page and certifies that each of the provisions set forth is clear and legible.

ja_pa_aa PrG Golf Lease Agmt ProInk only final ver.doc

Lessee initials X _CSR_

shall be an amount equal to (i) the total of all Rent and any other amounts, if any, due with respect to such Equipment as of the date of payment of the Stipulated Loss Value, plus (ii) all future Rent with respect to such Equipment, plus (iii) the then estimated FMV of such Equipment as of the end of the Initial Term of Lease, for such Equipment (assuming no loss or damage); the Stipulated Loss Value if the Pay For Play, and shall be an amount equal to the average rounds per month as set forth in the Payment Schedule times the Usage Fee times the number of months remaining in this Agreement. If, due to theft, destruction, damage or other loss, the Equipment is non-operable for more than seven days, Lessee shall pay to Lessor an amount, pro-rated for each day that the Equipment is non-operable, equal to the number of rounds for each month set forth in the Payment Schedule times the Usage Fee.

**14. INSURANCE.** Lessee shall keep in effect an "All Risk" extended coverage property insurance policy covering the Equipment for its full replacement value. Lessee shall also carry a comprehensive general liability insurance policy or other similar form of third party liability coverage. Such policies shall be in form, amount and with insurers acceptable to Lessor. The property insurance policy shall name Lessor and its assigns as Loss Payee and the general liability insurance policy shall name Lessor and its assigns as an Additional Insured. Each policy shall provide (a) for no less than thirty (30) days prior written notice of cancellation or non-renewal to Lessor, and (b) that such policy shall not be invalidated as against Lessor or its assigns for the violation of any term of the policy by Lessee. Lessee appoints Lessor as Lessee's attorney-in-fact to request required insurance coverages, make claims, receive payments and execute and endorse all documents, checks, drafts or other instruments necessary or advisable to secure payments due under any policy contemplated hereby. The foregoing shall not relieve Lessee from its obligations to procure the insurance policies required herein, to have timely insurance claims and to otherwise cooperate with insurance carriers and Lessor in seeking insurance coverage and recoveries in connection with the Equipment. Proceeds from any general liability policy shall be made payable first on behalf of the Lessor to the extent of its liability, if any. All policies of insurance carried by Lessee, whether primary or excess, shall be primary as to any policies maintained by Lessor. If Lessee does not provide Lessor with evidence of proper insurance within 10 days of Lessor's request or Lessor receives notice of policy cancellation, Lessor may (but is not obligated to) obtain insurance on Lessor's interest in the equipment at Lessee's expense. Lessee agrees to pay all insurance premiums and related charges. Because of increased credit risks to Lessor when not insured, Lessee agrees to pay to Lessor each month a risk charge stipulated and liquidated at 35% of Lessor's original Equipment cost until Lessee provides proof of compliance with insurance requirements. In spite of the payment of such risk charge, Lessee has no right or claim to any insurance benefits from Lessor. Lessee is still liable for all losses, and such risk charge is not in lieu of the insurance requirements of this Lease.

**15. TITLE.** Lessor is the owner of and will hold title to the Equipment. Lessee will keep the Equipment free of all liens and encumbrances. If this transaction is deemed to be a lease intended for security, Lessee grants Lessor a purchase money security interest in the Equipment (including any replacements, substitutions, additions, attachments and proceeds).

**16. DEFAULT.** Each of the following is a "Default" under this Lease. (i) Lessee fails to pay any Rental Payment or any other payment within 5 days of its due date; (ii) Lessee does not perform any of Lessee's other obligations under this Lease or in any other agreement with Lessor; (iii) Lessee or guarantor becomes insolvent, dissolves, or assigns its assets for the benefit of creditors, or enters any bankruptcy or reorganization proceeding; (iv) any guarantor of this Lease dies, does not perform its obligations under the guaranty. In addition, the following will also be Default considered a "Default" under the Lease, if the Payment Schedule is Pay For Play, (v) Lessee's failure to use reasonable care with respect to the Equipment and such failure continues for five or more calendar days after Lessor gives written notice to Lessee of Lessee's misuse of the Equipment or any of its components, (vi) Lessee turns the Equipment off (Lessee has 24 hours in which to cure this default), (vii) Lessee fails to collect the Usage Fee in accordance with the Pay For Play Payment Schedule (Lessee has 24 hours in which to cure this default), (viii) at any time Lessee changes the structure of the Usage Fee to Counter Optional (giving the customer a choice to use the system at point of sale).

**17. REMEDIES.** If a Default occurs, Lessor may do one or more of the following: (i) Lessor may cancel or terminate this Lease or any other agreement that Lessor has entered into with Lessee; (ii) Lessor may require Lessee to immediately pay Lessor, as compensation for loss of Lessor's bargain and not as a penalty, a sum equal to the Stipulated Loss Value, (iii) Lessor may require Lessee to deliver the Equipment to Lessor as set forth in paragraph 8; (iv) Lessor or its agent may peacefully repossess the Equipment without court order and Lessee will not make any claims against Lessor for damages or trespass or any other reason; and (v) Lessor may exercise any other right or remedy available at law or in equity. Lessee agrees to pay all of Lessor's costs of enforcing Lessor's rights against Lessee, including reasonable attorney's fees. If Lessor takes possession of the Equipment, Lessor may sell or otherwise dispose of it with or without notice, at a public or private sale, and apply the net proceeds (after deducting all costs related to the sale or disposition of the Equipment) to the amounts that Lessee owes Lessor. Lessee agrees that if notice of sale is required by law to be given, 10 days notice shall constitute reasonable notice. Lessee will remain responsible for any amounts that are due after Lessor has applied such net proceeds.

**18. PERFORMANCE OF LESSEE'S OBLIGATIONS BY LESSOR.** If Lessee fails to make any payment or perform any act or obligation required hereunder, Lessor may, but need not, make such payment or perform such act or obligation at the expense of Lessee. Any such expense incurred by Lessor shall constitute additional Rent due hereunder and shall be payable by Lessee to Lessor upon demand. Such action by Lessor shall not be deemed a cure or waiver of any default by Lessee.

**19. FINANCE LEASE STATUS.** Lessee agrees that if Article 2A Leases of the Uniform Commercial Code applies to this Lease, this Lease shall be considered a "finance lease" as that term is defined in Article 2A. By signing this Lease, Lessee agrees that either (a) Lessee has reviewed, approved, and received, a copy of the Supply Contract or (b) that Lessor has informed Lessee of the identity of the Supplier, that Lessee may have rights under the Supply Contract, and that Lessee may contact the Supplier for a description of those rights. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY ARTICLE 2A.

Lessee has reviewed this page and certifies that each of the provisions set forth is clear and legible.

Lessee initials X ___CJP___

**20. ASSIGNMENT.** LESSEE MAY NOT ASSIGN, SELL, TRANSFER OR SUBLEASE THE EQUIPMENT OR LESSEE'S INTEREST IN THIS LEASE. Lessor may, without notifying Lessee, sell, assign, or transfer this Lease or its rights in the Equipment. Lessee agrees that the new owner will have the same rights and benefits that Lessor has now under this Lease but not Lessor's obligations. The rights of the new owner will not be subject to any claim, defense or set-off that Lessee may have against Lessor.

**21. INDEMNITY.** Lessee assumes the risk of liability arising from possession, operation, or use of the Equipment. Lessee shall indemnify, defend and hold harmless the Lessor, its directors, officers, employees, shareholders, agents, successors and permitted assigns (the "Indemnified Party"), from any and all claims, costs, taxes, expenses, damages, and liabilities arising from or pertaining to the use, possession, or operation of the Equipment.

**22. CREDIT INFORMATION.** Lessee authorizes Lessor and its agents to obtain credit bureau reports, make other credit inquiries that Lessor determines necessary. Upon Lessee's written request, Lessor will inform Lessee whether Lessor has requested a consumer credit report and the name and address of any consumer credit reporting agency that furnished a report. Lessee acknowledges that without further notice Lessor may use or request additional credit bureau reports to update Lessor information, so long as Lessee's obligations to Lessor are outstanding. Lessee shall at Lessor's request, deliver to Lessor, Lessee's future quarterly and annual reports of financial condition, which reports Lessee represents and warrants shall be prepared in accordance with generally accepted Accounting Principles.

**23. FURTHER ASSURANCES.** Lessee agrees to promptly, at Lessee's expense, deliver such other reasonable documents and assurances, and take such further action as Lessor may request, in order to effectively carry out the intent and purpose of this Lease.

**24. REPRESENTATIONS AND WARRANTIES.** Lessee represents and warrants to Lessor that: (i) the making of this Lease by Lessee is duly authorized on the part of Lessee and upon execution thereof by Lessee and Lessor they shall constitute valid obligations binding upon, and enforceable against, Lessee; (ii) neither the making of this Lease nor the due performance thereof by Lessee, including the commitment and

payment of the Rent, shall result in any breach of, or constitute a default under, or violation of, Lessee's certificate of incorporation, by-laws, or any agreement to which Lessee is a party or by which Lessee is bound; (iii) Lessee is in good standing in its state of incorporation and in any jurisdiction where the Equipment is located, and is entitled to own property and to carry on business therein; and (iv) all financial information provided by Lessee to Lessor is true, accurate and provides a good representation of Lessee's financial condition. If requested, Lessee shall provide Lessor a Certified Copy of its Corporate Resolutions and or a Certificate of Incumbency in the form provided by Lessor or such other form that Lessor deems acceptable.

**25. MISCELLANEOUS.** Lessee agrees that the terms and conditions contained in this Lease make up the entire agreement between Lessee and Lessor regarding the Lease of Equipment. The declaration of invalidity of any provision of this Lease and/or Guaranty shall not affect any part of the remainder of the provisions of this Lease and Guaranty. Any change in any of the terms and conditions of this Lease must be in writing and signed by Lessor. Lessee agrees however, that Lessor is authorized, without notice to Lessee, to insert the Lease Number, and to supply missing information or to correct obvious errors in this Lease. If Lessor delays or fails to enforce any of Lessor rights under this Lease, Lessor will still be entitled to enforce those rights at a later time. All notices shall be given in writing by the party sending the notice and shall be effective the day personally delivered, the day after being sent by nationally recognized overnight delivery service (subject to signature verification), and three business days after the deposit in the U.S. Mail, addressed to the party receiving the notice at its address shown on the front of this Lease (or to any other address specified by that party in writing) sent first class mail, certified, return receipt requested, or when actually received, if earlier. All of Lessor's right and remedies, including but not limited to those set forth in Sections 11, 21 and 24 herein, shall survive and remain in full force and effect and be enforceable after the expiration or termination of the Lease for any reason. It is the express intent of the parties not to violate any applicable usury laws or to exceed the maximum amount of time price differential or interest, as applicable, permitted to be charged or collected by applicable law, and any such excess payment will be applied to Rent in inverse order to maturity, and any remaining excess will be refunded to Lessee. If more than one Lessee has signed this Lease each of the Lessees agree that Lessee's liability is joint and several.

Lessee has reviewed this page and certifies that each of the provisions set forth is clear and legible.

Lessee initials **X** CSP



**PFG**
*Golf Finance*

A division of Information Leasing Corporation
995 Dalton Avenue • Cincinnati, OH 45203
With Questions call (800) 263-9499
FAX TO (888) 888-3695

Lease Number PL510800004

# SCHEDULE A (EQUIPMENT)

| Qty | Manufacturer | Description (Year, Model and Accessories) | Serial # | Serial # |
|-----|-------------|-------------------------------------------|----------|----------|
| 80 | Pro-Link | 10 Inch GPS Assemblies | | |

| Supplier(s) | (Address/County/City/State/Zip/Phone #) |
|-------------|------------------------------------------|
| Prolink, Inc 7970 South Kyrene Road Tempe, AZ 85284 (480) 961-8800 | |

| Location | (Address/County/City/State/Zip/Phone #) |
|----------|------------------------------------------|
| Redtail Golf Club 7900 Redtail Dr. Lakewood 011 (815) 477-0055 | |

Lessee has reviewed this page, and agrees the data on this Schedule A is accurate  Lessee Initials X

Page 6 of 6      10_24_03 PFG Golf Lease Agmt Prolink only final ver.doc

| Exhibit A<br>PL510800004 | The Village of Lakewood<br>DBA Redtail Golf Club<br>2500 Lake Ave<br>Village of Lakewood, IL 60014<br>P3A 10" Systems (Quantity) GPS Assemblies | | REDTAIL 10" PCU Serial Number |
|---|---|---|---|
| | | 80 | TFSB0423A138 |
| | | | TFSB0423A139 |
| | | Qty | TFSB0423A140 |
| 0200-0200-08 | P3A PCU 330 | 80 | TFSB0423A141 |
| 0200-0100-01C | Roof Assembly | 80 | TFSB0423A142 |
| | | | TFSB0423A143 |
| 0200-0041-01 | Bracket, Mounting, Club Car | 80 | TFSB0423A144 |
| 0300-0047-02 | Rear Struts (New) | 160 | TFSB0423A145 |
| 0300-0052-01 | Front Supports | 160 | TFSB0423A146 |
| | | | TFSB0423A147 |
| | | | TFSB0423A148 |
| | | | TFSB0423A149 |
| | | | TFSB0423A150 |
| 07-0100-0200-01 | Base Station Assembly | 1 | TFSB0423A151 |
| 07-0100-0210-01 | BRIU (Roof Unit) | 1 | TFSB0423A152 |
| 07-0100-0240-01 | BPIU (Shop GPS Unit) | 1 | TFSB0423A153 |
| | | | TFSB0423A154 |
| | | | TFSB0423A155 |
| | | | TFSB0423A156 |
| | | | TFSB0423A157 |

Exhibit A
9-11-04

TS.

| | | |
|---|---|---|
| TFSB0423A158 | TFSB0423A178 | TFSB0423A198 |
| TFSB0423A159 | TFSB0423A179 | TFSB0423A199 |
| TFSB0423A160 | TFSB0423A180 | TFSB0423A200 |
| TFSB0423A161 | TFSB0423A181 | TFSB0423A201 |
| TFSB0423A162 | TFSB0423A182 | TFSB0423A202 |
| TFSB0423A163 | TFSB0423A183 | TFSB0423A203 |
| TFSB0423A164 | TFSB0423A184 | TFSB0423A204 |
| TFSB0423A165 | TFSB0423A185 | TFSB0423A205 |
| TFSB0423A166 | TFSB0423A186 | TFSB0423A206 |
| TFSB0423A167 | TFSB0423A187 | TFSB0423A207 |
| TFSB0423A168 | TFSB0423A188 | TFSB0423A208 |
| TFSB0423A169 | TFSB0423A189 | TFSB0423A209 |
| TFSB0423A170 | TFSB0423A190 | TFSB0423A210 |
| TFSB0423A171 | TFSB0423A191 | TFSB0423A211 |
| TFSB0423A172 | TFSB0423A192 | TFSB0423A212 |
| TFSB0423A173 | TFSB0423A193 | TFSB0423A213 |
| TFSB0423A174 | TFSB0423A194 | TFSB0423A214 |
| TFSB0423A175 | TFSB0423A195 | TFSB0423A215 |
| TFSB0423A176 | TFSB0423A196 | TFSB0423A216 |
| TFSB0423A177 | TFSB0423A197 | TFSB0423A217 |

Exhibit A
9-22-04

 **PFG**
*Golf Finance*

# PAYMENT SCHEDULE
## Pay For Play

a division of Information Leasing Corporation
995 Dalton Avenue
Cincinnati, OH 45203
(800) 263-9499

For PFG Use Only

Lease Number PL510800004

## HISTORY OF ACTIVITY AND USAGE FEES AT THE GOLF COURSE

| Budgeted Golf Rounds by Month | 18 hole Individual Car Rounds | 9 hole Individual Car Rounds | Tournament or Outing Rounds | Member Rounds | Other | Discount & Comp 2% | Total Rounds |
|---|---|---|---|---|---|---|---|
| January | 0 | 0 | 0 | 0 | | 0 | 0 |
| February | 0 | 0 | 0 | 0 | | 0 | 0 |
| March | 210 | 100 | 0 | 0 | | 0 | 412 |
| April | 1500 | 150 | 100 | 300 | | 25 | 2369 |
| May | 2557 | 400 | 450 | 500 | | 40 | 4377 |
| June | 3712 | 500 | 600 | 500 | | 80 | 5912 |
| July | 4010 | 350 | 600 | 600 | | 80 | 6248 |
| August | 3966 | 370 | 600 | 500 | | 100 | 6241 |
| September | 2900 | 275 | 500 | 500 | | 75 | 4720 |
| October | 1176 | 100 | 300 | 400 | | 100 | 2416 |
| November | 307 | 75 | 100 | 250 | | 100 | 932 |
| December | 52 | 100 | 100 | 0 | | 0 | 192 |
| Total Rounds | 20,390 | 2420 | 3350 | 3650 | | 600 | 33836 |
| | | | | | | | |
| Round Type Usage Fee | $3.50 | $2.00 | $2.00 | $2.00 | | | |
| Total Budgeted Pay-for-Play remittance | | | | | | | |

(Check One)          [X] Optional PFP          PROLINK® will be programmed to allow a Golf Cart the opportunity to reject the continued use of PROLINK after a two to three hole trial period (the "Trial Period"). After the Trial Period, the course management system will report to Course Owner whether a Golf Cart has requested a refund. Should a Golf Cart request a refund, Course Owner shall refund the applicable Usage Fee(s) to the golfer(s) at the end of the round of golf.

          [ ] Non-Optional          Player is not given a refund option.

This Payment Schedule and its terms and conditions are hereby incorporated by reference into the Lease identified above.

| Lessee Village of Lakewood, IL. | Lessor **PFG Golf** a division of Information Leasing Corporation ("ILC") |
|---|---|
| X _(signature)_ 9-16-04 | X _(signature)_ |
| _Authorized Signature_          _Date_ | _Authorized Signature_ |
| MIKE TEAL  HEAD GOLF PROFESSIONAL | JAMES CRESS  VP  9-24-04 |
| _Print Name and Title_ | _Print Name and Title_          _Date_ |

Page 1 of 2    10_24_03 PFG Golf Lease Agmt Prolink only final ver doc



# PAYMENT SCHEDULE
## Pay For Play (continued)

## PAY FOR PLAY USAGE FEES

1.   Usage Fee. Once installation is complete, Lessee shall, on behalf of Lessor, collect the Equipment usage fees plus applicable taxes (collectively the "Usage Fee") in accordance with the Payment Schedule from each and every golfer at the time the green fee and cart fee are collected by Lessee. The amount of the Usage Fee to be collected may be changed by Lessor from time to time should Lessor reasonably determine that the actual number of rounds of golf played at the Golf Course are less than the budgeted rounds shown in the Payment Schedule. Lessor shall give Lessee written notice of a change in the Usage Fee at least seven days prior to the effective date of such change. A billable round is one in which the Equipment provides the basic functionality of the system including yardage and time clock for ahead or behind pace of play, whether or not that functionality has been disabled at the base.

2.   Payment of Usage Fees. Lessee agrees to submit its weekly rounds played to ProLink, Inc. using the weekly pay-for-play form below, via facsimile, email or a web site interface. The weekly round data will be due by the close of business on Tuesday of each week, for the prior week. Lessee agrees to allow Lessor to automatically withdraw funds from its bank account via the Automatic Clearing House program once a month. The Attached Invoice Customization is an authorization for Lessor to automatically withdraw funds from Lessee's bank account. The amount of funds debited will be based upon the number dollar amount reported by the Lessee for the prior month. Each week, Lessee agrees to use its reasonable efforts to cooperate with Lessor in reconciling the Lessee's weekly round data for the previous week with that recorded by the Equipment.

3.   Penalties and Interest. If Lessee's bank account does not have sufficient funds to cover the amounts due, Lessee will pay a $100 service charge for each unsuccessful payment. In addition, any amounts not paid within 10 days of the due date of the payment will incur interest at the rate of 1.5% per month, from the date the payment was due.

4.   Lessee as a Fiduciary. Lessee acknowledges that it is acting as a fiduciary of Lessor when collecting and remitting Usage Fees and has no right, title or interest in the Usage Fees. Lessee understands that any funds collected from Lessee's customer for the Equipment will be remitted to Lessor, whether the Equipment is considered to be fully functional or not.

5.   Right to Audit. Lessor may from time to time audit Lessee for the sole purpose of determining round counts and Usage Fees. If the audit reflects more than a 5% shortage in usage fees remitted to Lessor, Lessee shall pay the cost of the audit and pay the shortage of Usage Fees paid to Lessor plus a penalty of 20% of the shortage. Lessee will provide for reasonable access to auditors to perform such audit.

## WEEKLY PROLINK PAY FOR PLAY COLLECTIONS FORM

Course Name  Village of Lakewood, IL

Week Ending

| Round Type | Number of Rounds per course POS | | | | | | | Weekly Round Total | Rate per Round | Total Dollars |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mon. | Tues. | Wed. | Thurs. | Fri. | Sat. | Sun. | | | |
| 18-Hole | | | | | | | | 0 | | $ |
| 9-Hole | | | | | | | | 0 | | $ |
| Member | | | | | | | | 0 | | $ |
| Complimentary | | | | | | | | | | |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | $ |

Total Amount Due:  $ _____

Reporter's Signature _____  Date  9-18-04

Reporter's Printed Name:  Mike Jean

Page 2 of 2    10_24_03 PFG Golf Lease Agmt Prolink only final ver doc

 **PFG** Golf Finance

# CERTIFICATE OF ACCEPTANCE

a division of Information Leasing Corporation
995 Dalton Avenue • Cincinnati, OH 45203
With Questions call (800) 263-9499
FAX TO (888) 888-3695

Lease Number PL510600004

In compliance with the terms, conditions and provisions of the Lease Agreement dated **8/20/04**

("Lease") by and between the undersigned ("Lessee") and PFG Golf ("Lessor"), Lessee hereby:

a) certifies and warrants that all Equipment described in the above-referenced Rental Schedule (the "Equipment") is delivered, inspected and fully installed, and operational as of the Acceptance Date as indicated below,

b) accepts all the Equipment for all purposes under the Lease and all attendant documents as of this _16th_ day of _September_ (month), 200 _4_ (Acceptance Date")

c) agrees that for this Certificate of Acceptance, and the Equipment relative to the same, the Amount of Each Rental Payment shall be in the amount of $_____ per period.

OR

As shown on the Payment Schedule attached hereto

d) restates and reaffirms, as of such Acceptance Date, each of the representations, warranties and covenants heretofore given to Lessor in the Lease

e) In the case of a Pay For Play Payment Schedule agrees upon a billing start date of _September 21st_

X _____ _Head Golf PROFESSIONAL_
Signature                    Title

Lessor is hereby authorized to insert serial numbers on the Rental Schedule

## ADDENDUM TO PAY-FOR-PLAY AGREEMENT

THIS ADDENDUM TO PAY-FOR-PLAY AGREEMENT (hereinafter referred to as "Addendum"), is made and entered into effective as of the _26th_ day of _August_, 2004, between the following parties Village of Lakewood, Il Dba Redtail Golf Club and PFG Golf Finance a division of Information Leasing Corporation

WHEREAS, the parties entered into a Pay-For-Play Agreement # PL510800004 (the "Agreement") dated as of the _26th_ day of _August_, 2004, and

WHEREAS, the parties desire a modification of the terms of the Lease Agreement,

NOW THEREFORE, in consideration of the mutual covenants and benefits accruing to the parties, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows

**The Agreement shall be amended as follows:**

Personal Guaranty is deleted in its entirety

1.   In Section 1 **Terms and Conditions** Change " Governed by the laws of the State of Ohio" to "Governed by the laws of the State of Illinois" and Delete "and to the exclusive jurisdiction of any court located in the State of Ohio"

2.   In Section 4 **Ordering Equipment, Delivery and Acceptance:** change the last three words in last sentence from "within 24 hours" to "within three (3) days."

3.   In Section 6 **Term and Rent:** All references to late charges and penalties shall be deleted and reference shall be made to PAYMENT SCHEDULE Pay For Play Section 3 Penalties and interest

4.   In Section 10 **Standard Equipment Return Conditions:** Add to A. as the first sentence "It is understood and agreed between that parties that reasonable wear and tear will be acceptable as a condition of return.

5.   In Section 10 **Standard Equipment Return Conditions:** In sub C, as well as in Section 17 Remedies, replace words "Stipulated Loss Value" with "Full Replacement Value". As well as in Section

6.   In Section 12 **Purchase Option: Automatic Renewal.** In the third sentence delete "for an additional 12 month term and thereafter renew"

7.   In Section 13 **Loss or Damage:** In sub e replace words "Stipulated Loss Value" with "Full Replacement Value" and delete the sentence starting with "the Stipulated Loss Value if the Payment Schedule is Pay-For-Play" and replace with "the Full Replacement Value shall be an amount equal to the then full retail value of such equipment.

8.  Section 16 **Default:** is hereby amended such that Lessor agrees to provide Course Owner with written notice and 10 days thereafter to cure any default hereunder, except where such notice would prejudice any claim or action of PFG arising out of or in connection with the Equipment or Lease.

9.  In Section 21 **Indemnity:** Add the following sentence to the end of the paragraph. "Lessee's indemnification obligation shall not extend to any liability caused by the Lessor, its agents or subcontractors."

10. In Section 24 **Representations and Warranties:** Change the end of last sentence from "that Lessor reasonably deems acceptable" to "that Lessor and Lessee deem acceptable."

11. In Section 25 **Miscellaneous:** At the end of the third sentence beginning "Any changes." add "and Lessee."

**The Payment Schedule Pay For Play shall be amended as follows:**

12. In Section 1 **Usage Fees:** Add the following sentence after the second sentence. "The actual rounds vs. budget round shall be evaluated on a quarterly basis."

13. In Section 2 **Payment of Usage Fees:** Delete the third, fourth and fifth sentences.

14. In Section 3 **Penalties and interest:** Delete first sentence and in the last sentence delete "interest at a rate of 1.5% per month" and replace with a late fee of 1 ¼ % of the late balance or the maximum rate allowed by law whichever is lower.

15. In Section 5 **Right to Audit:** In the second sentence change 20% to 10% and add the following to the end of the sentence "unless the shortage was caused by a system error or by unintentional mistake."

16. Add Section 6 **Conversion:** At any time during the term of this agreement, course may request of Lessor to convert from an optional pay-for-play program to a non-optional pay for play program. Upon receipt of request to convert, Lessor, at its sole discretion, shall establish a non optional Pay for Play rate and present new Round Type usage fees to course owner. Upon agreement by both parties of new non-optional pay for play rate and final acceptance by Lessor the Program the shall convert to non-optional within thirty days of Lessor acceptance.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be duly executed as of the date and the year first above written.

| LESSOR | LESSEE |
|---|---|
| PFG Golf & Turf, a Division in Information Leasing Corporation. | Village of Lakewood, IL dba Redtail Golf Club |
| BY _James Cross_ | BY _Catherine Peterson_ |
| NAME _JAMES CROSS_ | NAME _CATHERINE PETERSON_ |
| TITLE _VP_ | TITLE _Village Administrator_ |

LAW OFFICES

## ZUKOWSKI, ROGERS, FLOOD & McARDLE

50 VIRGINIA STREET

CRYSTAL LAKE, ILLINOIS 60014

(815) 459-2050

FAX (815) 459-9057

STEVEN J. GREELEY
sgreeley@zrfmlaw.com

February 22, 2006

**Via Facsimile**
Pro Link
Attn: President
7970 South Kyrene Road
Tempe, Arizona 85284

**Via Facsimile**
PFG Golf Finance
Pro Link
995 Dalton Avenue
Cincinnati, Ohio 45203

Re:     *Lakewood, Illinois - Redtail Golf Course*

To whom it may concern:

Our office represents the Village of Lakewood and Redtail Golf Course. They have asked us to review their relationship with you whereby you provide GPS devices for the Red Tail golf carts. Based upon representations made by Pro Link that these devices were worry free and cost effective, the Village allowed Pro Link to install these devices on its golf carts. Unfortunately, these representations were not true. The Village Board and golf course administrators have informed us of numerous daily difficulties with the GPS system. Service on the equipment is frequently required and on most occasions has been delayed causing extreme customer dissatisfaction. Also, the Village objects to the unauthorized mandatory changes to the payment terms, that ultimately resulted in overpayment for the service as promised in the documents.

Because of these problems, the Village Board asked us to review the validity of their arrangement with you. After a thorough review of the attached documents, state statute and applicable law, we have advised the Village Board that no contract exists between the parties.

Our reasons are as follows:

1.     65 ILCS 5/8-1-7(a) provides "Except as provided otherwise in this section, no contract shall be made by the corporate authorities...and no expense shall be incurred by...any municipality...unless an appropriation has been previously made concerning that contract or expense. Any contract made, or any expense otherwise incurred, in violation of the provisions of this section shall be null and void as to the municipality, and no money belonging thereto shall be paid on account thereof...."



EXHIBIT

B

ZUKOWSKI, ROGERS, FLOOD & McARDLE

Pro Link
February 22, 2006
Page 2

In essence, except for the limited circumstances set forth in 65 ILCS 8-1-7(b) et seq., a non home rule municipality cannot enter into multi-year agreements without prior appropriation. This rule of law was most recently reinforced by the 2nd District Appellate Court (in which Lakewood is located) in Nielsen-Massey Vanillas Inc. v City of Waukegan, 276 Ill.App.3d 146, 657 N.E.2d 1201, 212 Ill.Dec. 856 (2nd Dist. 1995).

These documents were executed in August, 2004. The Village did not appropriate funds prior to their execution as required by 65 ILCS 8-1-7(a), rendering the contract void. The Village has not appropriated funds since and the Village does not intend to appropriate funds for GPS in the fiscal year budget commencing May 1, 2006.

We reviewed the exceptions in 8-1-7(b) to this limitation on government contracting and do not believe they apply. However, even if one or more exceptions in 65 ILCS 8-1-7(b) allowed the Village to contract here, this does not eliminate the prior appropriation prohibition. Moreover, the exceptions in 65 ILCS 8-1-7(b) apply only within the term of the President in office at the time the contract was ratified. Here, the document was executed in August, 2004. The term of the President expired April 30, 2005, and since President Richardson was elected in April 2005 and assumed office in May 2005, any exception expired then also.

In our review of the law we found no basis for you to assert the contract is still in effect if funds were not appropriated for the contract. You apparently recognized this fact as you have forwarded amended documents to the Village which attempt to address the prior appropriation issue. We do not think they do. Moreover, none of these documents have been approved or executed by the Village.

Based upon this we are advising the Village to return the GPS equipment to you. Kindly, contact the Village to arrange for and orderly transfer of this equipment to you.

As indicated earlier, the Village Board has been most dissatisfied with this arrangement. As a consequence, they have asked us to pursue a cause of action against you to recoup the monies already paid. We have reviewed this issue and while we feel the Village's position has merit, the costs and time of litigation are a factor the Village must consider. In order for all parties to put this behind them, we believe the Village Board would be amenable to provide a release of liability to you if the transfer of GPS equipment and termination of the agreement can be completed prior to the commencing of the golf season.

Kindly acknowledge receipt of this notice. If your understanding of Illinois law is different then ours, we would appreciate knowing this as soon as possible. Otherwise, if we do not hear from you within 14 days we will assume your understanding of the Illinois law is the same as ours. Also, if you disagree with our analysis kindly provide us with case and statutory





**YARDAGE TO THE PIN.**
As you approach each tee, a full layout of the hole including hazards is displayed. The yardage (within 1-2 yards) to the daily pin placement is displayed and updated as you play the hole.

**SPEED-OF-PLAY.**
Slow play is not a problem as the speed-of-play of all cars on the course is continually monitored.

**CART-PATH-ONLY.**
For cart-path-only, you can use the moveable ball icon to determine precise yardage to any point on the hole.

# WITH PROLINK, YOU CAN GET GAME

ProLink, the #1 GPS system in the world, is a state-of-the-art yardage and scoring system. The full-color ProLink monitor on each golf car acts as a professional caddie and gives you the opportunity to improve your skills, experience PGA-type scoring and enhance your overall play.

As the car moves about the course, ProLink automatically displays photo-quality graphics of each hole. At a glance, you can see the entire hole with its yardage to the pin and access such features as playing tips, scoring and green distances that will keep you on course. With ProLink, you can communicate messages from your car to the clubhouse and even order lunch from the fairway...now that's a hole in one.

**GREEN FEATURE.**
Reaching the green is easy with the Green Feature. View pin placement, green contours and the distance to the front and back of the green.

**PRO TIP.**
To assist you in playing the hole, the Pro Tip features the pro's advice.

**FOOD & BEVERAGE.**
Hungry? You can order lunch right from your car for immediate pick-up at the turn's snack bar.

**MESSAGING.**
You can receive messages from the pro shop or send a message of your own requesting medical assistance or a ranger.





EXHIBIT

F

ALL-STATE LEGAL®



#### TOURNAMENT SCORING THAT
#### MAKES YOU A REAL-TIME LEADER

ProLink's ScoreMaster is the ultimate in interactive tournament scoring. The real-time scoring capabilities of ScoreMaster turn an ordinary event into a customized, interactive, tour-like event for golfers of all skill levels.

**BEFORE PLAY...**
ScoreMaster allows your tournament director or the course staff to easily set-up the event before play. The event rep enters all player information (names and handicaps), determines the format (such as scramble, best ball, etc.), adds in any contest holes (closest to pin, long drive) and pairs the players. The pairings are then transmitted to the corresponding golf cars.

**DURING PLAY...**
After you complete each hole, the Score Entry screen automatically prompts you to enter your scores on the ProLink monitor. As play progresses, these scores are updated in real-time and displayed on a leaderboard on the monitors - so at any time, you can see the standings of all golfers in the field.

**AFTER PLAY...**
Once the tournament is completed, the course staff can print individual scorecards as well as a prize list and hole-by-hole results. In addition, the leaderboard with the final results can be broadcast on closed-circuit TVs at the course during your event's awards reception.









#### DRIVING GOLF FARTHER



### GOLFER GUIDE



# ProLink Solutions GPS
# Course Management Systems

At ProLink Solutions, we are driving the technology in golf farther. Recognized as the industry innovator, ProLink's technology has produced a full suite of products designed to address your challenges as a course manager. The ProLink GPS Course Management Systems are designed to improve your operations, generate more revenue, and make your property more profitable. Imagine the power of attracting new tournament rounds to your course, or adding more tee times to your busiest days.

ProLink Solutions', real-time cart tracking, live tournament scoring, made-to-order food and beverage menus, detailed financial and maintenance reporting, and on-course advertising and promotions let you maximize the use of your course for optimum profits. Each ProLink feature helps make the most of your course and your time — from wherever you are.

With ProLink's powerful course management software, you can improve your course operations, generate added revenue and make your property more profitable.

## PROVEN TECHNOLOGY. PROVEN RESULTS.

Our Course Management Systems are the 3rd largest revenue-generating items to a course after green fees and cart rentals.

- Rounds are reduced by an average of 30 minutes, which enhances your golfer's experience which leads to repeat play
- Food and beverage revenues are increased by 30% - 40%
- The number of course personnel required is decreased
- Advertising and hole sponsorships add to revenue stream
- Simple and comprehensive tournament software can attract more tournaments to the course

ALL-STATE LEGAL®

EXHIBIT

G



*What If....*

YOU COULD MORE EFFICIENTLY OPERATE YOUR COURSE?

*"We have used the GPS system supplied and installed by ProLink Solutions at Valderrama for the past year. We have found it to be, by far, the best GPS system presently available on the market. I would highly recommend it to any club interested in this type of system."*

– Jaime Ortiz-Patiño, *president,*
Club de Golf Valderrama, ProLink course partner since 2004.



# Maximizing Course Efficiency

The course manager's job has never been easy but ProLink Solutions has made it simpler. You can access the many useful management functions built into ProLink's course management system at your pro shop or via the internet...so you can view your course from virtually anywhere.

ProLink's management tools ensure your course is running at its highest level of efficiency. Here are just a few examples:

## CART TRACKING

Manage pace of play with a real-time graphical view of the course and entire cart fleet. The carts are color-coded, indicating to the staff which carts are on time and which are not (including how many minutes they are behind). This results in increased efficiency and lower costs in marshalling operations, and enables cart attendants to manage the carts more effectively.

## MANAGEMENT REPORTS

There are an endless number of management reports available through the ProLink System, including pace of play (by cart by hole), cart usage, round summary, food and beverage usage, pace of play relative to pin location, as well as custom created reports. Course operators can print reports right from the management computer, resulting in more efficient management.

## TOURNAMENTS

Your course can offer the latest in PGA-type play with ProLink's Tournament scoring package. Each tournament is tailor-made so you can easily create tournaments sized from four to 144 (and beyond) for golfers of all skill levels. ProLink's tournament scoring offers real-time leaderboards, customized formats, hole-by-hole results, prize lists, cart signs, invoicing and more...the ultimate in interactive scoring from start to finish for you and your golfers.



*What If...*

YOU COULD MAKE YOUR GOLFER'S ROUND A MORE ENRICHING EXPERIENCE, RESULTING IN MORE REPEAT PLAY?

"ProLink Solutions has helped me decrease my average playing time by over 30 minutes ... adding tens of thousands of dollars to my bottom line. At the same time, our guest satisfaction index has gone up."

— Cary Corbitt, Director of Sports,
The Sea Pines Resort, ProLink course partner since 2003

# Golfer Benefits



ProLink's 10.4" monitor – along with its many tools – not only helps your golfers improve their skills, but ensures them a remarkable, enriching experience on your course.

## ENRICHING EXPERIENCE

ProLink's large, on-the-cart monitor acts as a professional caddie and is designed to be informative, not obtrusive. As the cart moves about the course, the system automatically presents photo-quality graphics of each hole. At a glance, golfers can see the entire hole, including sand, water, bunkers, trees and rough areas. They can also see where they are in reference to the cart in front of them. Pro Tips can be accessed for quick advice from your course's pro.

Golfers can also order food and beverages from the convenience of the cart, and can quickly communicate with the pro shop for emergency assistance, send for a ranger, report a lost or found club, and reply to surveys.

## SCORING

ProLink's interactive tournament scoring turns an ordinary event into a customized, interactive, tour-like event for golfers of all skill levels. Your golfers will always know their standing with the live leader boards presented on the ProLink monitor, your pro shop workstation and clubhouse TVs.

ProLink makes your tournament tasks trouble-free, keeps your golfers entertained, and leads to more tournament rounds at your course – that's not something all courses can offer.



*What If...*

AS YOU VENTURE INTO NEW TERRITORY, YOU COULD GO WITH THE LEADER?

"A high end GPS system is required to compete in our upscale market. ProLink has delivered as promised and their support has been fantastic. Best of all their system has helped raise our guest satisfaction to another level."

— Kenneth Kimura, Golf Operations Manager,
Kauai Lagoons, ProLink course partner since 2005



## Your Trusted Partner

You shouldn't have to go it alone. At ProLink Solutions, we understand the value of first-rate customer support. To start, our installation crews will work side-by-side with you to see that your cart fleet is fully operational in a timeframe that meets your needs. Next, comprehensive training of course staff will have you and your employees taking advantage of all the features built into the system.

Once the system is installed, ProLink ensures virtually trouble-free operation with our PROPLEDGE® Service and Maintenance Agreement. With PROPLEDGE®, customer support technicians are available via phone 24 hours a day, 7 days a week to answer all your technical questions. In addition, our Service Technicians will visit your course on a monthly basis to maintain the integrity of the system and to install any new software upgrades that are available. With PROPLEDGE, we ensure the system continues to operate at the same superior level of performance as it did the day it was installed. In addition, we can monitor the performance of your carts through ProLink's diagnostics command center to catch potential problems before they occur.





*At ProLink Solutions,*

WE'RE COMMITTED TO PARTNERING WITH YOU, SO WE CAN TURN WHAT IF'S INTO REALITY, AS A TEAM.

*Call us or visit our website to find out more.*

Photo: The Sea Pines Resort, ProLink Course Partner Since 2003

# ProStar



ProStar's 10.4" display, with large font sizes allows golfers of all ages to view our dynamic graphical overview, distances to the pin, fairway hazards, landmarks, undulations, pro tips, pace of play timer and radial arc for cart path only holes, along with many other features.

## INCREASED SPEED OF PLAY

Round times are decreased with the GPS distance information for the golfers and the timer on the in-cart computer display. Round times may be reduced as much as 30 minutes, resulting in more tee times on your busiest days.

*ProStar*



## TWO-WAY COMMUNICATION

Send speed of play reminders, storm warnings, and promote upcoming events and daily specials in the pro shop. Golfers are able to quickly communicate with the pro shop for emergency assistance, send for a ranger or beverage cart, report a lost or stolen club, and respond to surveys.

## INCREASED SALES

Golfers can order food and beverages with ease right from their cart. This feature enables the F&B manager to place higher margin items on the menu that take longer to prepare. By making the turn faster and more efficient, golfers are more likely to order a meal rather than a snack and a drink.



## MANAGEMENT REPORTS

Maintain and regulate operations at peak performance with data reporting; analyze F&B sales, cart activity and player trends in graph and text formats for any day, month or year.



*ProStar*

# ADVERTISING AND MARKETING

The demographics of the golf community combined with the average number of riding rounds on ProLink courses make it possible for advertisers to reach both the desired quality and quantity of their target market. The ad display message is strategically integrated with beneficial course and hole information, which is constantly viewed by golfers during play. Maximizing the opportunity to sell advertising through ProLink's advertising programs generates additional revenue for your course, which offsets the cost of the system.

### Experience increased revenues from displaying:

- Food and Beverage promotions
- Pro Shop and Grill Specials
- Tournaments and Events
- Corporate Sponsorships
- Community Real Estate
- Pro Shop Merchandise



You could have your event here!
Contact our pro shop personnel for details.

ProStar's AdManager software simplifies the advertising process at the course with an easy to use program designed to put on-course advertising information at your fingertips, allowing you to manage every aspect of ad placement on the ProLink GPS system:

- Preview the graphic layout of an ad
- Implement or change ads
- Create scorecard banner ads
- Create custom ads for tournaments/events
- Manage and inter-change ads
- Create, modify or replace food and beverage ads
- Store a "palette" of different images to choose from or change out
- Upload ads to the GPS system without technical assistance

*ProStar*



# TOURNAMENTS



**ScoreCast™**
Golf Tournament Software

Tournament setup has never been easier, thanks to ScoreCast Golf Tournament Software integrated into the ProStar system. Designed by the PGA of America, ScoreCast tournament software allows for a simple and comprehensive tournament set-up. Any format and any number of tournaments can be carried out simultaneously. Tournament directors can market the GPS system to bring more tournaments to your course. System features allow for additional revenue, such as electronic tee and hole sponsorship and real-time leaderboard presentation.

## ELECTRONIC SCORING

The ProStar system and ScoreCast Tournament software make scoring simple for golfers. As the golfer completes each hole, the score entry screen automatically prompts them to enter their scores on the system. As play progresses, the scores are updated in real-time on the leaderboard, so at any time, the golfer can see who the leaders are and what hole they are playing.



"A high end GPS system is required to compete in our upscale market. Pro
delivered as promised and their support has been fantastic. Best of all their
has helped raise our guest satisfaction to another level."

– Kenneth Kimura, Kauai Lagoons, Kauai HI

HOME    COMPANY    PRODUCTS    SUPPORT    COURSES    INVESTO

# Patents

**Golf course yardage and information system**
United States Patent #5,689,431
Issue Date: November 18, 1997

**Golf cart roof**
United States Patent #D394,637
Issue Date: May 26, 1998

**Remote golf ball locator**
United States Patent #5,873,797
Issue Date: February 23, 1999

**Golf course yardage and information system**
United States Patent # 5,878,369
Issue Date: March 2, 1999

**Map-matching golf navigation system**
United States Patent #6,024,655
Issue Date: February 15, 2000

**Golf course yardage and information system**
United States Patent #6,236,360
Issue Date: May 22, 2001

**Display monitor for golf cart yardage and information system**
United States Patent #6,236,940
Issue Date: May 22, 2001

**Magnetic wheel sensor for vehicle navigation system**
United States Patent #6,446,005
Issue Date: September 3, 2002



EXHIBIT

H

**Display monitor for golf cart yardage and information system**
United States Patent #6,470,242
Issue Date: October 22, 2002

**Golf course yardage and information system with zone detection**
United States Patent #6,525,690
Issue Date: February 25, 2003

**Golf distance measuring system and method**
United States Patent #5,364,093
Issue Date: November 15, 1994
In 2001, ProLink Solutions entered into a licensing agreement whereas they have the entire right, title and interest in US Patent No. 5,364,093 ('093). This patent was granted for 20 years, ending November 2011.

 Behind the scenes and on the course, ProLink Solutions add value, increase revenues and provide a richer experience for players and course managers. Contact Us to learn more about how ProLink GPS Systems can help you. Toll Free: 888-802-1022 sales@goprolink.com

©2006 PROLINK    410 S. BENSON LN, CHANDLER, AZ 85224    800-483-5951    CONTACT



( 3 of 3 )

| United States Patent | **6,470,242** |
|---|---|
| Rudow , et al. | **October 22, 2002** |

## Display monitor for golf cart yardage and information system

### Abstract

A player position determining and course management system for a golf course having a plurality of roving units for use by players in playing the course is disclosed. Each roving unit includes a central processing unit (CPU) including a data processor for executing various tasks ranging from fastest-execution of a task to slowest execution of a task on a schedule of priorities of task completion, a real-time means for controlling the processor to give the tasks priority ranging from fastest execution of a task with highest priority to slowest execution of a task with lowest priority, and a means for precisely timing functions of the system including modulating means utilizing a common digital modulation technique for digitally modulating data transmitted to and from all of the roving units. Each of the roving units include a monitor for displaying the golf course including each of the holes with its tee box, fairway, green, cup and hazards, as well as the position of the roving unit on the course in real time. Additionally, the system includes a course management base station for transmitting and receiving information to the roving units and a monitor for displaying the location of each roving unit on the golf course in real time.

Inventors: **Rudow; Richard W.** (Mesa, AZ), **Coffee; John** (Gilbert, AZ), **Lecker; Douglas L.** (Chandler, AZ), **Bingeman; Kirk H.** (Chandler, AZ), **Camiano; Robert D.** (Phoenix, AZ)
Assignee: **Prolink, Inc.** (Tempe, AZ)
Appl. No.: **09/818,916**
Filed: **March 28, 2001**

### Related U.S. Patent Documents

| Application Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|
| 259344 | Mar., 1999 | 6236940 | |
| 525905 | Sep., 1995 | 6236360 | |
| 423295 | Apr., 1995 | 5689431 | |

| Current U.S. Class: | | **701/1** ; 701/300 |
|---|---|---|
| **Current International Class:** | | A63B 57/00 (20060101); G01S 5/00 (20060101); G01S 5/14 (20060101); A63B 55/08 (20060101); G05D 001/00 (); G01S 005/00 () |
| **Field of Search:** | | 701/1,300,207,208,211 |

## References Cited [Referenced By]

### U.S. Patent Documents

| 1806059 | May 1931 | Hoople |
|---|---|---|
| 1868031 | July 1932 | Sudbrink |
| 1944468 | January 1934 | Schaffner |
| 3531178 | September 1970 | Wirth |
| 4014589 | March 1977 | Yerkey |
| 4032222 | June 1977 | Lapeyre |
| 4100372 | July 1978 | Hypolite |
| 4101159 | July 1978 | Stewart |
| 4235523 | November 1980 | Lapryre |
| 4241870 | December 1980 | Marcus |
| 4419655 | December 1983 | May |
| 4505054 | March 1985 | Clark et al. |
| 4521078 | June 1985 | Baeger |
| 4640199 | February 1987 | Zigman |
| 4650238 | March 1987 | Healey |
| 4668026 | May 1987 | Lapeyre et al. |
| 4684164 | August 1987 | Durham |
| 4818010 | April 1989 | Dillon |
| 4837551 | June 1989 | Iino |
| 4867498 | September 1989 | Delphia et al. |
| 4908611 | March 1990 | Iino |
| 5004320 | April 1991 | Nagai et al. |
| 5040990 | August 1991 | Suman et al. |
| 5050922 | September 1991 | Falcoff |
| 5064974 | November 1991 | Vigneau et al. |
| 5095430 | March 1992 | Bonito et al. |
| 5096271 | March 1992 | Portman |
| 5127044 | June 1992 | Bonito et al. |
| 5344020 | September 1994 | Ferguson |
| 5381267 | January 1995 | Woody |
| 5438518 | August 1995 | Bianco et al. |
| 5486840 | January 1996 | Borrego et al. |
| 5524081 | June 1996 | Paul |

| | | |
|---|---|---|
| 5589849 | December 1996 | Ditzik |
| 5596246 | January 1997 | Budzilek et al. |
| 5662395 | September 1997 | Lechman |
| 5697176 | December 1997 | Kuni et al. |
| 5745292 | April 1998 | Jones |
| 5822023 | October 1998 | Suman et al. |
| 5871251 | February 1999 | Welling et al. |
| 5927792 | July 1999 | Welling et al. |

*Primary Examiner:* Zanelli; Michael J.
*Attorney, Agent or Firm:* Blank Rome Comisky & McCauley LLP

---

### *Parent Case Text*

---

RELATED APPLICATIONS

This application is a continuation of Ser. No. 09/259,344, filed Mar. 1, 1999, now U.S. Pat. No. 6,236,940, which is a division of Ser. No. 08/525,905, Sep. 8, 1995, now U.S. Pat. No. 6,236,360, which is a continuation-in-part of Ser. No. 08/423,295, filed Apr. 18, 1995, now U.S. Pat. No. 5,689,431.

---

### *Claims*

---

What is claimed is:

1. A golf cart adapted to support an occupant, said cart having a roof with an underside, a video display monitor mounted on the underside of the roof in a position for ease of viewing by the occupant in sunlight and without substantially interfering with the occupant's view forward of the cart.

2. The golf cart of claim 1, wherein the underside of the roof has a flat black coating applied thereto for ease of viewing by the occupant in sunlight.

3. The golf cart of claim 1, wherein the video display monitor has a screen and a black bezel surrounding the screen.

4. The golf cart of claim 1, wherein the video display monitor is a color monitor that displays video images in color.

5. The golfcart of claim 1, wherein the video display monitor has a screen, the cart comprising a component of a system for use in determining the relative position of and distance between objects on a golf course, said video display monitor displaying the objects on the screen.

6. The golf cart of claim 1, wherein the cart has a seat for the occupant and the roof has a forward portion and a rearward portion, the video display monitor being mounted to the underside of the roof at the forward portion thereof and forwardly of the seat for ease of viewing by the occupant.

7. A golf cart having a seat and a roof with an underside, a video display monitor having a screen and

being mounted at the underside of the roof forward of the seat in a position for ease of viewing by an occupant in the seat and without substantially interfering with the occupant's view forward of the cart, the underside of the roof having a flat black coating for ease of viewing the screen of the monitor in sunlight.

8. The golf cart of claim 7, wherein the video display monitor is a color monitor that displays video images in color.

9. A golf cart adapted to support an occupant, said cart having a roof with an underside, a video means for displaying objects on a golf course, the video means being mounted on the underside of the roof in a position for ease of viewing by the occupant in sunlight and without substantially interfering with the occupant's view forward of the cart.

10. The golf cart of claim 9, wherein the objects comprise tee boxes, fairways, greens, cups and hazards of the golf course.

11. The golf cart of claim 10, wherein the cart comprises a component of a system for use in determining the relative position of and distance between objects on a golf course.

---

## *Description*

---

## BACKGROUND OF THE INVENTION

The present invention relates generally to yardage systems and more particularly to a new and improved golf course yardage and information system.

Before starting play on an unfamiliar or infrequently played course, golfers typically familiarize themselves with the layout of each hole. This gives the golfer the knowledge at the tee box of a particular hole being played, for example, as to whether the hole is a `dog leg left`, a `dog leg right`, or straight; whether any hazards, such as sand traps, bunkers, and water traps, are hidden from view; whether and where the range is posted to calculate yardage from the ball's (and the golfer's) present location to the front of the green, the rear of the green, the pin, a key hazard, or a desired lay up position for the green approach shot.

Customarily, golf courses market informative books on the course in the pro shop, to indicate layout features for each hole and yardage from a few locations along the hole to the center of the green. Also, yardage markers typically are provided on sprinkler heads along the route of each hole, so that the player will know the range from that point to the center of the green. These playing aids provide information on the hole layout and location of hazards, and also allow the golfer, by pacing off yardage from the ball to the nearest sprinkler head, to estimate yardage from the ball to the center of the green. Such measures are by no means precise, but do enhance one's knowledge of the hole, and thereby, an opportunity to improve one's game. They also exact a cost--slowing the pace of play of every golfer behind the one or more who are familiarizing themselves with the course, pacing off yardage, and so forth. Slow play has an adverse effect on the course's daily revenue, as well as on other players' enjoyment of the game.

Various proposals have been made toward improving golf course information systems. The intent of these ostensible improvements has been to reduce the average player's score; to increase enthusiasm and speed of play; and to enhance the player's knowledge of the course regarding every hole, the yardage from the ball or "lie" to the green, the distance and bearing to the pin, and the location of hazards.



---

| United States Patent | 6,236,940 |
|---|---|
| **Rudow , et al.** | **May 22, 2001** |

---

## Display monitor for golf cart yardage and information system

### Abstract

A ball position determining and course management system for a golf course includes a base station for course management and a plurality of golf carts for use during play of the course. The base station and the golf carts are adapted to operate in conjunction with a system for use in determining the relative position of and distance between objects on the course. Each golf cart has a roof and a monitor for displaying a map of each hole of the golf course with its tee boxes, fairways, greens and cups, and hazards. The monitor is mounted on the underside of the roof for shading and ease of viewing in sunlight, and has a screen which is canted back by a predetermined angle to reduce the amount of light reflected from the screen into the eyes of a viewer seated in the golf cart. The underside of the roof has a diffuse, black coating to reduce the reflectivity of its surface and to enhance the contrast of the display on the monitor. The monitor displays images in color, and the map of each hole of the course displayed on the monitor has selected features in distinctive colors relatively closely matching those of the respective actual features of each hole, for enhanced realistic display. The position determining system enables the position of the respective golf cart itself to be displayed in real time on the monitor as a unique symbol whose movement tracks that of the golf cart on the displayed map.

---

Inventors: **Rudow; Richard W.** (Mesa, AZ), **Coffee; John** (Gilbert, AZ), **Lecker; Douglas L.** (Chandler, AZ), **Bingeman; Kirk H.** (Chandler, AZ), **Camiano; Robert D.** (Phoenix, AZ)
Assignee: **Prolink, Inc.** (Tempe, AZ)
Appl. No.: **09/259,344**
Filed: **March 1, 1999**

---

| **Current U.S. Class:** | **701/300** |
|---|---|
| **Current International Class:** | A63B 57/00 (20060101); G01S 5/00 (20060101); G01S 5/14 (20060101); A63B 55/08 (20060101); G01S 005/00 () |
| **Field of Search:** | 701/215,213,214,208,211,300 340/989,990 40/592,593 342/357.08,357.09 |

---

## References Cited [Referenced By]

### U.S. Patent Documents

| | | |
|---|---|---|
| 4419655 | December 1983 | May |
| 5438518 | August 1995 | Bianco et al. |
| 5524081 | June 1996 | Paul |
| 5697176 | December 1997 | Kuni, Jr. et al. |

*Primary Examiner:* Zanelli; Michael J.
*Attorney, Agent or Firm:* Blank Rome Comisky & McCauley LLP

### *Parent Case Text*

CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a division of co-pending application Ser. No. 08/525,905, filed Sep. 8, 1995.

### *Claims*

What is claimed is:

1. A ball position determining and course management system for a golf course, comprising a base station for course management and a plurality of golf carts for use during play of the course, each of the base station and the golf carts being adapted to operate in conjunction with a system for use in determining the relative position of and distance between objects on the course, each golf cart having a roof, and means for displaying a map of each hole of the golf course with its tee boxes, fairways, greens and cups, and hazards; said means for displaying comprising a monitor mounted on the underside of the roof of the respective golf cart for shading and ease of viewing said monitor in sunlight.

2. The system of claim 1 further including means for generating a data base driven graphical user interface (GUI) for displaying a plurality of windows on said monitor.

3. The system of claim 1, wherein

said monitor has a screen canted back by a predetermined angle with respect to a vertical reference line, to reduce the amount of light reflected from the screen into the eyes of a viewer seated in the golf cart.

4. The system of claim 1, wherein

said underside of the roof has a diffuse coating to reduce the reflectivity of the surface thereof.

5. The system of claim 1, wherein

said underside of the roof has a black coating to enhance the contrast of the display on the monitor.

6. The system of claim 1, wherein

said monitor is a color monitor to display images in color, and

the map of each hole of the course displayed on the monitor has selected features in distinctive colors relatively closely matching those of the respective actual features of each hole, for enhanced realistic display.

7. The system of claim 6, wherein

said monitor has a screen canted back by a predetermined angle with respect to a vertical reference line, to reduce the amount of light reflected from the screen into the eyes of a viewer seated in the golf cart.

8. The system of claim 6, wherein

said underside of the roof has a black coating to enhance the contrast of the display on the monitor.

9. The system of claim 1, further including:

timing means in the position determining system for enabling the position of the respective golf cart itself to be displayed in real time on the monitor as a unique symbol whose movement tracks that of the golf cart on the displayed map.

---

## *Description*

---

## BACKGROUND OF THE INVENTION

The present invention relates generally to yardage systems and more particularly to a new and improved golf course yardage and information system.

Before starting play on an unfamiliar or infrequently played course, golfers typically familiarize themselves with the layout of each hole. This gives the golfer the knowledge at the tee box of a particular hole being played, for example, as to whether the hole is a `dog leg left`, a `dog leg right`, or straight; whether any hazards, such as sand traps, bunkers, and water traps, are hidden from view; whether and where the range is posted to calculate yardage from the ball's (and the golfer's) present location to the front of the green, the rear of the green, the pin, a key hazard, or a desired lay up position for the green approach shot.

Customarily, golf courses market informative books on the course in the pro shop, to indicate layout features for each hole and yardage from a few locations along the hole to the center of the green. Also, yardage markers typically are provided on sprinkler heads along the route of each hole, so that the player will know the range from that point to the center of the green. These playing aids provide information on the hole layout and location of hazards, and also allow the golfer, by pacing off yardage from the ball to the nearest sprinkler head, to estimate yardage from the ball to the center of the green. Such measures are by no means precise, but do enhance one's knowledge of the hole, and thereby, an opportunity to improve one's game. They also exact a cost--slowing the pace of play of every golfer behind the one or more who are familiarizing themselves with the course, pacing off yardage, and so forth. Slow play has an adverse effect on the course's daily revenue, as well as on other players' enjoyment of the game.

Various proposals have been made toward improving golf course information systems. The intent of these ostensible improvements has been to reduce the average player's score; to increase enthusiasm and